| 36 | 255 |
| 89 | 573 |
| 36 | 255 |
| 109 | 460 |
| 36 | 255 |
| 127 | 319 |

# THE PEOPLE OF THE STATE OF CALIFORNIA *v.* FRANKLIN TAYLOR.

EVIDENCE OF ABUSIVE LANGUAGE MERELY—WHEN AND HOW ADMISSIBLE IN MUR-
DER TRIAL.—On the trial of T. for the murder of L., the evidence tended to
prove that T., who being sufficiently intoxicated to have become noisy and quar-
relsome, had, about three hours before the homicide, by throwing missiles, broken
a window in the house of L., and after being arrested therefor at the instance of
the wife of L., at which he was greatly incensed, and while temporarily dis-
charged from said arrest had continued, until the beginning of the rencounter
which resulted in the homicide, to indulge, in the presence of divers persons in a
public room, in language of gross abuse of L. and his wife—to the effect that L.
kept a whorehouse, and that L.'s wife was a whore, etc.—all of which was uttered
within the hearing or cognizance of L.; that thereupon L. walked a considerable
distance to a saloon kept by him, where, having provided himself with two or
more flint glass saloon tumblers stowed in his pockets, sought out T , of whom he
demanded to know why he had smashed his house, and why he abused his family
as detailed; to which T. replied by a denial—whereupon L. gave T. the lie, and
immediately after, as T. was going into the street from the room where this
scene, as well as much of said abuse had occurred, L. threw one of said tumblers
at T., which, striking his head, knocked him down; and while still down, or in
the act of rising up, L. threw another tumbler at T., which, however, missed
him ; whereupon T. grasped L. by the shoulder with one hand and dealt him
several stabs in the side with the blade of a pocket clasp knife held in the other
hand, of which wounds L. immediately after died. The testimony in relation to

said window breaking, and to said abuse of L. and wife, was introduced by the prosecution while making out the case for the People, in chief, under the objection and exception of T. thereto on the ground of irrelevancy. In the course of his defense T. offered to prove the truth of his said language, admitted in evidence—which offer was refused by the Court upon objection made thereto by the prosecution. *Held*, first, that said evidence, admitted under T.'s objection, was material and relevant for the defense, as showing primarily a reasonable and probable motive for said attack made by L. on T., without at the same time affording any legal justification therefor; second, as tending to show less obviously, yet possibly, that the conduct of T., as given in evidence, was for the purpose of provoking said attack made by L., and so convert it into a shield for the murder with which T. was charged; third, that while said evidence was relevant, yet its logical and legal effect at the trial was misdirected to the prejudice of T., by the course adopted by the prosecution, in proving both sides of the case, and then undertaking to rebut so much of the evidence as tended to justify the homicide, instead of proving the homicide simply and resting; and fourth, that the Court properly refused said evidence which was proffered by T. in defense.

INSTRUCTION TO JURY.—It is not error for the Court, on the trial of a party for murder, to instruct the jury fully on the law applicable to murder in both degrees, rather than to limit the charge to the law applicable to manslaughter and excusable homicide, where there is any evidence, however slight, tending to show that the offense committed was murder in either degree. On the contrary, it would be error in such case to refuse to give such instruction if demanded on the part of the People. The policy of the prohibition contained in the Constitution against charging juries in matters of fact is discussed and questioned.

IDEM—MAY BE FRAMED WITH REFERENCE TO ANY REASONABLE HYPOTHESIS AS TO THE FACTS.—In preparing instructions, each party may assume any reasonable hypothesis in relation to the facts of the case, and ask the Court to declare the law as applicable to it; and it is error to refuse an instruction so framed because the case supposed does not include some other hypothesis equally rational.

IDEM.—Every instruction which correctly declares the law applicable to the case which it supposes, if the case can be rationally inferred from the testimony, should be given.

LEGAL MALICE.—The bare existence of hatred, ill will, and the like, does not amount to legal malice; but evidence of previous hatred and ill will is always allowed in cases of homicide as tending to prove active or legal malice at the time the homicide was committed.

IDEM.—Legal malice, or the malice aforethought of the statute, denotes a wrongful act done intentionally, and without legal cause or excuse.

APPEAL from the District Court, Tenth Judicial District, Sierra County.

The first and second instructions asked on the part of the defendant, and refused by the Court, were as follows:

"1st. If it appears from the evidence that John Lewis, the deceased, made the first attack upon Taylor, the defendant, with glass tumblers or bottles, and that the danger of great bodily harm to Taylor from such attack was so urgent and pressing that in order to save himself from such bodily harm it was necessary for him to kill Lewis, the jury should find the defendant not guilty; but it is not necessary, under the statutory rules found in sections thirty and thirty-one, that the jury shall find that the killing was absolutely necessary beyond the possibility of a doubt, for that could be made to appear only upon the infliction of the injury by the assailant, against which the person assailed is permitted to protect himself by killing the assailant. It is only necessary that the circumstances should be such as to make it to appear to the party assailed, and to a reasonable man, that it is necessary for the party assailed to strike the blow that resulted in death, in order to protect or defend himself from great bodily harm; and if such were the circumstances of the case, and the defendant struck the fatal blows under such reasonable fears of great bodily harm to himself from the attack of Lewis, he should be found not guilty.

"2d. The mere fact, if it be so, that the defendant used the most insulting language concerning Lewis and his wife, did not justify Lewis in attacking defendant with glass tumblers or otherwise; and if from the evidence you believe that Lewis made such attack with glass tumblers or bottles, or other missiles capable of inflicting great bodily harm, and that such attack was so made and followed up by Lewis as to make it appear to defendant and a reasonable person that in order to save himself from great bodily harm it was necessary for the defendant to strike the fatal blows, without any other provocation than such insulting language as above stated, then the defendant should be found not guilty."

The other facts are stated in the opinion of the Court.

*Van Clief & Cowden,* for Appellant.

33

*Jo Hamilton, Attorney General,* for the People.

The points and authorities made and cited in the briefs of counsel are stated and discussed in the opinion of the Court.

By the Court, SANDERSON, J.:

The defendant was tried for murder, and convicted of manslaughter. He moved for a new trial, which was denied, and then appealed. The grounds of the motion are: First—Insufficiency of the evidence; Second—Error in admitting and excluding evidence; Third—Error in charging the jury.

The case shows that Lewis, the deceased, was the keeper of a drinking saloon, which was a part of the same building in which his family resided. That early in the evening, and some three or four hours before the homicide was committed, the defendant was sufficiently intoxicated to be noisy and quarrelsome, and in all probability broke a window of the building occupied by the deceased and his family, for which the wife of the deceased caused his arrest. That he appeared very much enraged at the arrest, and, when taken before the magistrate, indulged in gross abuse of the deceased and his family—to the effect that he kept a whorehouse, and that his wife was a whore; that it was an outrage for a gentleman to be arrested because some boy had thrown a stone at the window of a whorehouse, and other like expressions. That his examination was postponed by the magistrate until the next day, and the defendant was discharged from arrest upon his promise to go home and report to the magistrate the next morning. That after his discharge he went about town, visiting the drinking saloons, complaining of his arrest, and repeating his abuse of the wife of the deceased whenever and wherever he could find a listener, and remarked to one of the witnesses that he would make the house of the deceased a lonely or desolate house. That about eleven o'clock he was at the store of the witness Young, with whom he had a quarrel of words, in the course of which he repeated

his previous remarks about the wife of the deceased, and accused the witness of having had sexual intercourse with her, which the witness denied. How much of this abuse of himself and his wife the deceased heard, or was cognizant of, does not directly appear, but it is probable that he heard or was cognizant of more or less of it. While the defendant was wrangling with Young, the deceased was standing about fifty feet distant in conversation with the witness Green, and from the fact that the deceased remarked to Green that it was "rather rough," and Green advised him to take no notice of it, it is quite certain that the deceased heard and understood the general tenor of the defendant's remarks to Young. The deceased replied to the advice of Green that he had tried to bear it till the present time, and then walked to his saloon, from which he afterwards returned and walked to the place where the defendant and Young were still wrangling. He was met on the way by the witness Trelore, who asked him where he was going. The deceased replied that he was going to take a walk. Anticipating a "muss," in the language of the witness, Trelore turned and followed him. The deceased continued his walk until he reached the defendant and Young, and immediately thereafter the personal encounter between the deceased and the defendant, which resulted in the death of the former, commenced. Only two witnesses—Young and Trelore—saw the commencement of the fight. In their account of it they do not agree in all respects. Both agree that the conversation which preceded the fight was commenced by the deceased, who asked the defendant, in substance, why he had been smashing his house and abusing him and his family, and that the defendant denied that he had done so. After which, according to Young, the lie was passed by both, but whether the first lie was given by deceased, or the defendant, he was unable to say, and both parties immediately clinched. According to Trelore's statement, the lie was given by the deceased from first to last, who immediately thereafter, in the language of the witness, "went to his pocket for a tumbler or something, and as Tay-

lor stepped into the street, threw it at him, and as he (the witness) thought, hit Taylor on the head, breaking the tumbler, or whatever it was, into pieces. That Taylor fell on his hands, and while he was down, or in the act of rising, the deceased threw another tumbler at him, which, as the witness thought, missed him. That Taylor rose and seized the deceased by the shoulder with his right hand, and struck him several blows with his left in the ribs. That the defendant then whirled around and ran into a saloon, followed by deceased;" where, as other witnesses testified, he threw two more tumblers at the defendant, without, however, hitting him. Young thought that the thing first taken from his pocket by the deceased was a bottle, and not a tumbler; that the deceased struck at the defendant, but missed him. This witness was, doubtless, mistaken in supposing that it was a bottle, and not a tumbler, as he himself stated that he looked the next morning for a bottle, or its broken pieces, and found neither, but found other pieces of glass. The case, also, otherwise shows that the things used by the deceased were "flint glass tumblers," such as are commonly used in drinking saloons, and that, in all probability, he armed himself with them at his own saloon, just after leaving witness Green, and just before he walked from his saloon to the place of the encounter. The case also shows that the deceased had no other weapons. It also shows that the blows given by the defendant were given with an ordinary clasp knife with a blade a little less than three inches in length, and that the wounds thus inflicted caused the death of the deceased shortly after he entered the saloon to which the defendant had fled. It would also seem that the defendant must have had the knife open in his hand at the time, or before the encounter, for Young stated that he had no time to get it from his pocket and open it afterward.

To the testimony in relation to the breaking of the window and the language used by defendant in respect to the character of the wife and house of the deceased, the defendant objected as irrelevant. The Court sustained the objection as

to the language not uttered in the presence or hearing of the deceased, but overruled it in other respects, to which ruling the defendant excepted, and when his case was reached offered to prove that the house and wife of the deceased were of the character which he had given them. The Court refused to allow him to do so, to which ruling the defendant also excepted. These two exceptions constitute the only errors which the appellant has specified under the second ground of his motion for a new trial.

Upon the question whether the testimony in relation to the defendant's breaking the window and his abusive language was relevant, we cannot help thinking that counsel ought to occupy inverted positions, if, as claimed by counsel for the appellant, the fatal contest was sought and commenced by the deceased, armed with means by which great bodily harm, if not death, could be readily inflicted. The plea of the defendant being self defense, his plea would have been sustained, rather than prejudiced, in the eye of the law at least, by testimony of that character, for its tendency was to show a reasonable and probable motive for the attack of the deceased, without at the same time affording any legal justification therefor. The breaking of the window, the vile abuse of himself and wife, were calculated to inspire him with a desire to chastise the defendant and avenge his insulting acts and language, without, at the same time, affording him any legal justification, however much he might be justified by a vitiated popular sentiment. It fully illustrated and explained his motive, and would, therefore, have been relevant testimony on behalf of the defendant, and, in our judgment, most material testimony; for, taken in connection with the fact that just before the contest he left the place where he was standing in conversation with Green, and where, as we have already seen, he must have heard the conversation between the defendant and Young, and walked in a direction opposite to that in which the defendant was standing, to his own saloon, and there filled his pockets with tumblers, and then went directly to the defendant, it tended

to show an attack with a preconceived and deliberate intent to inflict great bodily harm, if not death, by the use of means adequate to such a purpose, thereby bringing the case within the law of self defense.

In our judgment, the weight of the testimony shows that the contest was commenced by the deceased. Young makes it a case of mutual combat; but admits that at the time and just before the commencement of the contest he was himself engaged in a controversy of words with the defendant, which he feared might at any moment culminate in personal violence, and was, therefore, as might be reasonably expected, in a state of excitement altogether inconsistent with a cool and accurate observation of events. On the contrary, the witness Trelore was in no way concerned in the transaction, and was, therefore, perfectly cool and self possessed; and there is no reason to suppose that he was at all prejudiced in favor of the defendant, for he stated upon the stand that he thought the defendant deserved a whipping, and he was anxious to see him get it. His testimony places the whole legal responsibility of the contest upon the shoulders of the deceased, and his testimony, moreover, is consistent with all the intrinsic probabilities arising from the conduct of the deceased in first going to his saloon for tumblers, which are dangerous if not deadly weapons, and then seeking the defendant, not in a hasty and excited manner, as if wrought upon by a sudden and perhaps transient impulse, but with that calm and deliberate movement which indicates a fixed and settled purpose. In view of those facts, by themselves considered, there can be little doubt but that had the defendant been slain the homicide would have been declared murder by all the cases. Thus, as it appears to us, the more obvious and primary effect of the testimony was in favor of the very party who complains of its admission. It is true that its less obvious and secondary effect might have been to show that the conduct of the defendant was adopted for the purpose of provoking the attack which followed it, and so convert the attack into a shield for murder. No jury would

be warranted, however, in adopting the secondary effect, except under the pressure of very strong circumstances. On the contrary, they should give to such testimony its more obvious and primary effect, unless satisfied by other circumstances in evidence that there was a deliberate design on the part of the slayer to provoke an attack, and if successful, to do murder under the pretense of self defense. If such circumstances existed, or if such was the theory of the prosecution, the testimony in question became double-edged and might cut both ways. It was, then, relevant for a double purpose: first, to show cause for hatred, grudge, and revenge upon the part of the deceased; and second, the existence of like germs of crime in the breast of the defendant. It is true, as suggested by the learned counsel for the defendant, that the bare existence of hatred, ill will, and the like, does not amount to legal malice; but proof of hatred, ill will, and the like is always allowed in cases of homicide, for they are smouldering embers which may be kindled into active or legal malice when touched by the wand of opportunity. Such proof is allowed upon the same principle that proof of threats, which are the outward expressions of ill will and hatred or malice not yet active, is received, because it tends to show active or legal malice at the time the fatal blow is given, or the malice aforethought of the statute, which denotes a wrongful act done intentionally and without legal cause or excuse.

While, as already indicated, our conclusion is that the testimony in question was relevant, a careful perusal of the record satisfies us that its logical and legal effect was misdirected, to the prejudice of the defendant, which is mainly due to the course adopted by the prosecution in proving both sides of the case, and then undertaking to rebut so much of the evidence as tended to justify the homicide, instead of merely proving the homicide and resting. Had the prosecution pursued the latter course, the defendant would have naturally introduced the evidence in question for the purpose, as we have seen, of showing a state of facts which

would have amounted to murder in the deceased, had the
defendant been killed, and thus establish a necessity for
the killing of the deceased by the defendant, in order to save
his own life or protect his person from great bodily harm.
The prosecution could then have shown, or argued from the
testimony introduced by the defendant, that the necessity
was not forced upon the defendant, but invited and inten-
tionally provoked by his conduct; or, in other words, that it
was not a necessity created by the deceased, but an opportu-
nity sought by the defendant.

While ordinarily the defendant will have no legal cause to
complain of the prosecution for proving his case also, yet if
such a course leads to a confusion of ideas, and, under their
influence, to a wrong appreciation of material testimony, it
cannot be said that the defendant has not been prejudiced, or
that he has had a fair trial. Naturally, juries do not look to
the prosecution for the facts upon which the defendant relies,
and they, therefore, are liable to be misled, if the facts come
from that side, and to be put upon a false scent from which
they cannot be readily retrieved. We think such was the
result in this case. There seems to have been an impression
maintained throughout the trial that the legal effect of the
testimony in question was against the defendant, which, as
we have seen, was, in part at least, an erroneous impression,
and, therefore, prejudicial to the defendant, for, as already
suggested, the fact that the deceased went to his saloon to
provide himself with tumblers, in connection with his sub-
sequent conduct, tended to show an intent on his part to
inflict upon the person of the defendant great bodily harm
at least, and the testimony in question supplied a motive
which served to explain and illustrate the attack of the
deceased upon the defendant, and the intent with which it
was made.

The Court did not err in excluding the testimony offered
by the defendant for the purpose of proving the truth of his
statements as to the character of the house and wife of the
deceased. That was a side issue which the prosecution was

not bound to try, and which did not materially affect the grounds of the contest between the deceased and the defendant. (*Clark* v. *Willett*, 35 Cal. 534.)

To the instructions of the Court, it is first objected generally that they contain matters of law not applicable to the facts of the case, and, therefore, calculated to confuse and mislead the jury. They contain, among other matters, the several sections of the statute in relation to murder in both degrees, manslaughter—both voluntary and involuntary—and justifiable and excusable homicide; also the sections of the statute which define legal malice; also an extract from the opinion of this Court in the case of the *People* v. *Sanchez*, 24 Cal. 17, in relation to the distinction between the two degrees of murder. It is argued on the part of the defendant that the case made by the prosecution was, at most, but a homicide, committed in a sudden and mutual combat, and that the Court should, therefore, have confined its charge to the law of manslaughter and the law of self defense. This would be so, doubtless, if the theory of the appellant was the only plausible theory, or if the prosecution accepted it as the true theory, (*People* v. *Byrnes*, 30 Cal. 206;) but the prosecution claimed that it was a case of murder; and it cannot be denied that there was some testimony to support the claim. It may have been very slight, but if there was any testimony tending that way it would have been error to refuse to charge upon the question of murder. The prosecution had proved an old quarrel against the defendant; that he had but a short time before the homicide, threatened to make the house of the deceased " a lonely or desolate house;" and that he had broken a window, and vilely abused the deceased and his wife, for the purpose, as the prosecution contended, of provoking a contest and converting it into an opportunity to kill the deceased under the pretense of self defense. From these facts the prosecution might, with some show of reason, argue that the homicide was murder, and, if so, the Court, whatever might be its own opinion, could not, under the Constitution of this State, which prohibits Judges from charging

34

in respect to facts, decline, without error, to present for the consideration of the jury the law applicable to that theory, should they find it the true theory of the case. If mischief results from such a course, it is not due to the Court, but to the inflexible rule by which the Court is governed. At common law Judges are not thus fettered, but are allowed to charge in respect to facts, and express their opinion as to the weight of evidence. (*People* v. *King*, 27 Cal. 513.) They may, therefore, direct the attention of the jury to the facts and circumstances which they deem to be of controlling weight, and warn them against false lights. Which is the wiser rule is not for us to say; but it admits of serious doubt whether the cause of justice has been promoted by the adoption of the rule by which the Courts of this State are governed. There could have been no object for the change except to afford to life and liberty further protection against judicial dishonesty and tyranny. Such a movement would have found fitting occasion when Henry VIII divorced his wives and kindled the fires of the *auto de fe*, or when Jeffreys advised and judicially enforced the despotic and sanguinary measures of James II; but, in this day and place, the ermine is not the gift of tyrants, but of the people, whose will is subserved by an honest—not corrupt—exercise of its functions; and to deprive the jury of the aid and experience of the Judge in sifting and weighing the testimony may be of doubtful wisdom.

The objection to the eighth, ninth and twelfth instructions, upon the ground that the word " malice " is used in its popular sense, as denoting mere hatred and ill will, and not in its legal sense, as denoting an intent to do an unlawful act, without legal justification or excuse, becomes immaterial in view of the fact that the defendant was found guilty of manslaughter only.

This record fails to disclose upon what grounds the first and second instructions, asked on behalf of the defendant, were refused, and the Attorney General has failed to suggest any ground upon which the ruling of the Court can be sus-

tained. On the part of the defendant it is suggested that the only objection made to them was that the facts therein hypothetically stated did not embrace the theory of the prosecution, to the effect that the contest was provoked by the defendant for the purpose of doing murder under the pretense of self defense. If such was the ground of the ruling, we think the ruling was erroneous. In preparing instructions each party may assume any reasonable hypothesis in relation to the facts, and ask the Court to declare the law as applicable to it, and it is error to refuse merely because the case supposed does not include some other hypothesis equally rational.

We are unable to detect any substantial reason why the instructions in question should not have been given. Every instruction which correctly declares the law applicable to the case which it supposes, if the case can be rationally inferred from the testimony, should be given.

Judgment reversed, and a new trial granted. It is further ordered that the remittitur be issued forthwith.

Sprague, J., concurring specially·

I concur in the judgment, but dissent from the observations of the Court upon the propriety of the rule of law which prohibits a Judge from charging the jury in respect to matters of fact, or indicating an opinion as to the result of the evidence.

Sawyer, C. J., concurring specially:

I think the Court erred in refusing the first and second instructions asked on behalf of the defendant, and that the judgment should be reversed, and a new trial had on these grounds. I therefore concur in the judgment.