GEORGE WASHINGTON DAVIS V. STATE OF NEBRASKA.

FILED APRIL 21, 1897.   No. 8657.

1. **Murder: MALICE.** Malice is an essential element in the crime of murder, both at common law and under our statutes.

2. **Malice Defined.** "Malice," in common acceptance, means ill-will against a person; but in its legal sense it means a wrongful act done intentionally without just cause or excuse. *Housh v. State,* 43 Neb., 163, followed.

3. **Homicide: WRECKING OF TRAIN: MALICE: EVIDENCE.** The plaintiff in error was indicted for the murder of one Hambell, a passenger on a railway train, by displacing the fixtures of the railway track, thereby causing the wreck of the train and the instant killing of Hambell. *Held,* (1) Whether the prisoner in displacing the fixtures of the railway track acted maliciously was a question of fact for the jury, to be determined from all the circumstances and facts in evidence in the case; (2) that the prisoner's statements as to the motives which induced him to displace the fixtures of the railway track, while competent evidence, were not conclusive in his favor that he did not act maliciously; (3) that in order for the killing of Hambell to be murder in the second degree it was not essential that the evidence should show that the prisoner was possessed of a specific intent to either kill or injure Hambell or any other person upon the train.

4. ———: **MALICE: EVIDENCE.** When the fact of unlawful killing is proved, and no evidence tends to show express malice on the one hand, or any justification, mitigation, or excuse on the other, the law implies malice, and the offense is murder in the second degree.

5. ———: **EFFECT OF DELAY IN TRIAL.** The indictment against the prisoner was filed at the September, 1894, term of the court. There was a February, 1895, term, a May, 1895, term, and a September, 1895, term, at which latter term the prisoner was tried and convicted. He was put on trial at the February, 1895, term, and the jury, after hearing the evidence, failed to agree upon a verdict and were discharged. *Held,* Construing sections 390 and 391 of the Criminal Code, that the prisoner was not entitled to be

discharged because not brought to trial either before the end of the second or the third term of court, in which his case was pending, held after the indictment against him was found.

6. ————. By the constitution of the state the legislature is invested with plenary legislative power and the defining of crimes, and prescribing punishment therefor is a legislative function.

7. Constitutional Law: LEGISLATIVE POWER. Every legislative act comes before this court surrounded with the presumption of constitutionality, and this presumption continues until the act under review clearly appears to contravene some provision of the constitution.

8. ————: HOMICIDE. Section 93 of the Criminal Code does not violate any provision of the constitution. Said section is not void for uncertainty because the crimes of murder in the first degree, murder in the second degree, and manslaughter, are not defined in the proviso of said section.

9. Criminal Law: PUNISHMENT. A criminal statute is not void for uncertainty which prescribes as a punishment for doing a certain act the same punishment which is prescribed for doing another named act, when the same criminal code defines the latter act and prescribes its punishment.

10. ————: INSTRUCTIONS. While it is proper in a criminal case in defining a crime in an instruction to use the language of the statute descriptive of such crime, yet, if the import of the language used in the instruction is the same as the statute, an instruction will not be held erroneous because the language employed by the court is different from the language of the statute. *Long v. State*, 23 Neb., 33, followed.

11. ————: ————: REPETITIONS. The trial court is not obliged to repeat in every instruction the degree of proof required when the jury has been properly instructed that the state must make out its whole case beyond a reasonable doubt. (*Carleton v. State*, 43 Neb., 373.)

12. ————: ————: REVIEW. An instruction should be examined as a whole. All that the instruction contains should be looked to for the purpose of determining whether the party complaining of it was prejudiced by it. To single out a phrase, a word, or a sentence from an instruction and to examine such word or phrase separately from the other parts of the instruction is not a fair method of criticism.

13. ————: ————: ————. In an instruction the trial court used this language: "And if the jury find from the evidence that all the incriminating circumstances upon which the prosecution relies for a conviction will as well apply to some other person or persons as to the defendant, or if such facts and circumstances are reconcilable with any reasonable theory or hypothesis other than

Davis v. State.

the guilt of the defendant, or if such facts and circumstances, together with the direct evidence offered in this case, do not satisfy the minds of the jury beyond any reasonable doubt of the guilt of the defendant, then you should, by your verdict, acquit him." *Held*, Applying the rule just above stated, that the use by the court of the expression "incriminating circumstances," if error, was without prejudice to the prisoner. *Metz v. State*, 46 Neb., 547, distinguished.

14. ———: JURY: SPECIAL PANEL. In a county of seventy thousand inhabitants or more, where there is pending for trial in the district court a felony case, the judge of said court, if satisfied that a jury cannot be obtained from the regular panel to try such case, may direct the drawing and summoning of a special panel from which to select a jury to try such cause. (Code of Civil Procedure, sec. 668g.)

15. ———: ———: ———. And if in the selection of a jury the regular panel be exhausted and the jury selected be discharged before reaching a verdict, the judge of the district court may direct the drawing and summoning of a second special panel from which to select a jury to try said case.

16. ———: ———: ———. And in selecting a jury from such second special panel the accused, unless he demands that the exhausted regular panel shall be recalled and re-examined, cannot be heard to complain that the court erred in not causing that to be done.

17. Homicide: WRECKING OF TRAIN: EVIDENCE. The wreck which it was alleged the prisoner caused by displacing the fixtures of the railway track occurred on Thursday. The evidence against him was largely circumstantial. *Held*, Competent for the state to show that the prisoner was possessed of a superstitious belief that Thursday was a lucky day for him; that anything he attempted upon that day would succeed,—as this evidence tended to identify the prisoner as the man who displaced the fixtures of the railway track.

18. Criminal Law: CROSS-EXAMINATION OF WITNESS: BIAS. A litigant has the right to cross-examine a witness produced against him to show the interest, bias, or prejudice of such witness, but the extent to which such an examination may be carried is a matter resting very largely in the sound discretion of the trial court. *Consaul v. Sheldon*, 35 Neb., 247, followed.

19. ———: ———: ———: REVIEW. A case will not be reversed because of the limitation placed by the court upon the cross-examination of a witness as to his interest or bias, unless it appears from the record that the party against whom the witness was called was probably prejudiced by such limitation.

20. ———: RULINGS ON EVIDENCE. It is not error for a trial court, on its own motion, to refuse to permit a witness to answer a ques-

tion which calls for incompetent, immaterial, or irrelevant evidence.

21. ———: CROSS-EXAMINATION OF WITNESSES. It is not competent to prove the bias or prejudice of one witness by the cross-examination of another witness without at least first having cross-examined the first witness as to his interest, bias, or prejudice.

22. ———: WITNESSES: EXPUNGING ANSWERS. A litigant who propounds a question to a witness and obtains from him an answer responsive thereto cannot complain that the court erred in refusing on his motion to expunge such answer from the record.

23. ———: ———: ———. A party is not prejudiced by the refusal of the court to strike out testimony of a witness as to when a certain fact happened because the witness admits that he entered such fact in a book at that time and testifies from the entry rather than from his recollection, when it appears that the entry was correct and the party moving to strike out introduced in evidence the entry made in the book by the witness.

24. ———: TRIAL. ORDER OF INTRODUCING PROOF. The order in which a party shall introduce his proof is to a great extent discretionary with the trial court, and its action in that respect will not be cause for reversal when no abuse of discretion is shown. *Basye v. State*, 45 Neb., 261, followed.

25. ———: ———: PLEAS. There can never properly be more than one issue before the court in a criminal case at one time, and so long as the plea of not guilty remains on the record, a plea in bar is improper, and the state is under no necessity of replying or demurring to such plea, and the court, on its own motion, may disregard it. (*Marshall v. State*, 6 Neb., 120; *Korth v. State*, 46 Neb., 631.)

26. ———: ———: ———. If a prisoner, after a plea of not guilty, tenders a lawful and proper plea in bar, stating facts which have occurred or come to his knowledge since the entry of his plea of not guilty, and which facts, if true, entitle him to discharge, then it is the duty of the court to permit the prisoner to withdraw his plea of not guilty and file such plea in bar.

27. ———: ———: FORMER JEOPARDY. The prisoner, after a plea of not guilty and without withdrawing, or requesting to withdraw such plea, filed a plea of "former jeopardy" which was neither signed nor sworn to by the prisoner. *Held*, (1) That such plea in bar was invalid; (2) that the state was under no obligation to demur or reply to it, and that the court was justified in disregarding it and, on its own motion, striking it from the files.

28. ———: ———: ———. It seems that a plea of "former jeopardy" should set out the record; that is, the former indictment and acquittal or conviction, and the statements of fact, viz., the identity

of the person acquitted or convicted and the offense of which he was acquitted or convicted.

29. ———: ———: ———: INSANITY OF JUROR: DISCHARGE OF JURY. The prisoner was put on trial before a jury, and, after part of the evidence for the state was in, one of the jurymen became sick, was examined by a commission appointed by the court, and found and adjudged to be insane, whereupon the court discharged the jury without prejudice to the future prosecution of the prisoner and entered such facts, findings, and orders upon his record. On being brought to trial a second time the prisoner, by an invalid plea in bar, claimed the right to be discharged by reason of these facts. *Held*, (1) That the invalid plea in bar would be treated as a motion to be discharged, grounded on the actions and ruling of the court in the case as disclosed by the record; (2) that the insanity of a juror was an accident or calamity authorizing the discharge of the jury within the meaning of section 485 of the Code of Criminal Procedure; (3) that the action of the court in the premises was fully authorized by said section of the Code, and the record disclosed affirmatively that the prisoner had not been in "former jeopardy."

30. ———: CONFESSIONS. The *corpus delicti* is the foundation of every criminal prosecution, and the confession of an accused that he committed the crime is not alone sufficient evidence to sustain his conviction thereof. (*Ashford v. State*, 36 Neb., 38.)

31. ———: ———: EVIDENCE. The confessions of a prisoner that he committed the crime with which he is accused, if freely and voluntarily made, are competent evidence to be considered by the jury in connection with all other facts and circumstances in evidence in the case in determining whether the accused did in fact commit the crime with which he is charged.

32. ———: INSTRUCTIONS: REVIEW. The burden is upon the party complaining of the refusal of the district court to give an instruction not only to show that he was probably prejudiced by such refusal of the court, but that the entire instruction is correct as a proposition of law and applicable to the facts in evidence in the case.

33. ———: ———: ———. This court will not reverse a case because the court refused to give an instruction asked, when the substance of such instruction is included in other instructions given. (*Bush v. State*, 47 Neb., 642.)

34. ———: ———: REASONABLE DOUBT. The charge of the court on the subject of reasonable doubt set out in the opinion and approved.

35. ———: PRESUMPTION OF INNOCENCE. A defendant accused of a crime is presumed to be innocent, and such presumption begins with the accusation and continues until the state has established

24

the guilt of the defendant beyond a reasonable doubt. But it is not the law that a jury is bound to acquit an accused simply because one of the jurymen entertains a reasonable doubt of his guilt. In such a case the jury cannot convict; but it does not therefore follow that it then becomes the duty of the other jurymen to surrender their convictions and acquit.

36. ———: INSTRUCTIONS: EVIDENCE. It is not prejudicial error for a court in its charge to say to the jury that the evidence before them is both direct and circumstantial.

37. ———: ———: ———. The court, in an instruction, stated to the jury that there had been offered in the case both direct and circumstantial evidence. He then defined these two kinds of evidence and stated that the circumstantial evidence which had been received was legal and competent, and then said: "And if it is of such a character as to exclude every reasonable theory, supposition, or hypothesis other than that of the defendant's guilt, then, and in that event, it should be given the same weight by you as direct evidence." *Held*, (1) That the last clause of the instruction quoted was erroneous; (2) but when considered in connection with the remainder of the instruction, that it was error without prejudice; (3) that it was not an unconditional instruction to the jury to give the same weight to circumstantial evidence as direct evidence.

38. ———: ———: ———. The charge of the court on the subject of the weight of evidence and the credibility of witnesses set out in the opinion and *held* not prejudicially erroneous.

39. Homicide: WRECKING OF TRAIN: EVIDENCE. About 10 o'clock in the evening a train was derailed at a trestle and a passenger thereon killed. The defendant was indicted for causing the derailment of the train and the death of the passenger, by unscrewing the nuts from the fish-plate bolts with a monkey-wrench introduced in evidence, and by removing the spikes holding down a rail on the trestle with a claw-bar introduced in evidence, just prior to the occurrence of the wreck; and the evidence in behalf of the state tended to show that the defendant displaced the fixtures as charged. A witness testified for the defendant that he was fishing near the trestle where the wreck occurred on the afternoon of that day and that he left the locality about dark; that while in the vicinity he saw no one nor heard any noise about the trestle. Another witness testified, as an expert for the defendant, that it was impossible for a man with the monkey-wrench in evidence to unscrew the nuts on the fish-plate bolts of the railway track. The court permitted the state, in rebuttal, to prove by a non-expert that with the monkey-wrench in evidence he unscrewed eight nuts from as many fish-plate bolts on a portion of the said railway track, in all respects like the track on the trestle, with the exception that where the witness experimented the track was on the earth, and with the claw-bar in evidence he

also removed all the spikes which held down a rail, and that he did all this work in twenty-one minutes. *Held,* (1) That this evidence of the state was rebuttal testimony; (2) that the conditions of the track where the experiment was made were substantially the same as the conditions existing on the trestle where the alleged displacement of the fixtures was made, and that therefore the evidence was competent; (3) that the difference in conditions existing between the track where the experiment was made and the track where the displacement occurred did not render the evidence incompetent but was proper for consideration by the jury in determining the weight to be given to the evidence of the experiment.

40. ———: MOTION FOR NEW TRIAL: PRESENCE OF PRISONER. A person convicted of felony, and represented by counsel, cannot, as a matter of right, insist on being present in court either at the time of the filing, the argument, or the ruling upon his motion for a new trial. *Miller v. State,* 29 Neb., 437, followed.

41. New Trial: NEWLY-DISCOVERED EVIDENCE. The denial of a motion for a new trial upon the ground of newly-discovered evidence will not be held erroneous when it appears that the newly-discovered evidence is cumulative and would not probably change the result already reached.

42. Homicide: RAILWAY WRECK: EVIDENCE. The evidence examined, and *held* to sustain the finding of the jury (1) that the railway wreck and the death of Hambell were caused by the displacement of the fixtures of the railway track; (2) that the defendant purposely and maliciously displaced such fixtures.

ERROR to the district court for Lancaster county. Tried below before HOLMES, J. *Affirmed.*

*Alex. Altschuler* and *George A. Adams,* for plaintiff in error.

*C. J. Smyth, Attorney General, Ed P. Smith, Deputy Attorney General,* and *W. H. Woodward, County Attorney,* for the state.

RAGAN, C.

In the district court of Lancaster county George Washington Davis was convicted of the crime of murder in the second degree, for the killing of one William O. Hambell, by removing the nuts, bolts, fish-plates, angle bars, and

by displacing a rail of a bridge of the Chicago, Rock Island & Pacific Railway Company, thereby causing the derailment of a passenger train on which said Hambell was riding. Davis brings the judgment of life imprisonment pronounced against him upon such conviction here for review.

1. The first argument made by counsel for Davis is that the evidence is insufficient to sustain a conviction of murder in the second degree; that the evidence at most would sustain only a conviction of manslaughter. Section 4 of the Criminal Code provides: "If any person shall purposely and maliciously, but without deliberation and premeditation, kill another, every such person shall be deemed guilty of murder in the second degree." And section 5 of said code is as follows: "If any person shall unlawfully kill another without malice, * * * every such person shall be deemed guilty of manslaughter." Section 93 of the Criminal Code is as follows: "Every person who shall wilfully and maliciously remove, break, displace, throw down, destroy, or in any manner injure * * * the tracks, or any bridge, viaduct, culvert, trestle-work, embankment, parapet, or railroad in this state, now in operation, or which shall hereinafter be put in operation, or who shall willfully and maliciously place any obstruction upon the rail or rails, track or tracks of any such railroad shall be punished by imprisonment in the penitentiary not less than one year nor more than twenty years; *Provided, however,* That if any person shall, by the commission of either of the aforesaid offenses, occasion the death of any person or persons, the person or persons so offending shall be deemed guilty of murder in the first or second degree, or manslaughter, according to the nature of the offense, and, on conviction thereof, shall be punished as in other cases." The evidence, without controversy, shows that on the evening of August 9, 1894, the said William O. Hambell boarded a passenger train of the railway company at Fairbury, Nebraska, to come to the city of Lincoln, Nebraska; that

when said train was within about four miles of the city of Lincoln it was derailed or fell from a bridge on the railway and said Hambell was instantly killed.   The evidence also tended to show that certain fixtures of the railway track on the bridge had been displaced just prior to the time the train reached the bridge; that this displacement of the fixtures of the track caused the derailment of the train; and that Davis displaced the fixtures of said track.   Davis' explanation of the motive which prompted him to displace the fixtures of the railway track, as shown by the evidence of the state's witnesses, is that he intended to signal the train on which Hambell was a passenger, stop it, advise the persons on the train that the fixtures of the track had been displaced, in the hope that for his conduct in that respect the railway company would give him employment, or that the passengers on the train would make him a gift of some money; that he was not personally acquainted with Hambell, or any other person upon that train, and that he did not intend to cause the derailment of the train.   Aside from the facts and circumstances in evidence in the case this is the only explanation of the motive which influenced Davis in displacing the fixtures of this railway track, and the argument of his counsel is that since Davis was not acquainted with Hambell or any other passenger upon the train, since he had not in mind the specific intent to take the life or to injure any particular person upon the train, this evidence does not disclose that Davis, in removing the fixtures from the railway track, was actuated by malice against Hambell or any other person, and that, therefore the evidence is insufficient to sustain a conviction of murder in the second degree.   To do a thing maliciously is to do that thing with malice, and malice is an essential element in the crime of murder, both at common law and under the statute.   "Malice," in common acceptation, means ill-will against a person, but in its legal sense it means a wrongful act done intentionally without just cause or excuse.   (*Housh v. State*, 43 Neb., 163; *Bromage*

*v. Prosser*, 4 Barn. & Cres. [Eng.], 255; *Milton v. State*, 6 Neb., 136.) In *McClain v. Commonwealth*, 110 Pa. St., 263, it is said: "The distinguishing criterion of murder is malice aforethought. But it is not malice in its ordinary understanding alone,—a particular ill-will, a spite, or a grudge. Malice is a legal term implying much more. It comprehends not only a particular ill-will, but every case where there is a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." (*People v. Taylor*, 36 Cal., 255.) In order then for the jury to find that the spirit or purpose which actuated Davis in displacing the fixtures from this railway track was a malicious one it was not indispensable that the evidence should disclose that Davis was possessed of any ill-will, hatred, or malice towards Hambell, or any other person upon that train, or that he was acquainted with any person upon that train. Whether Davis, in displacing the fixtures of the railway track, was possessed of malice or acted maliciously was a question of fact for the jury, to be determined, like any other question of fact, from all the circumstances and facts in evidence in the case. As already stated, the purpose and intention which Davis had in mind in displacing the fixtures of the track is his statement of his purpose. This statement, while competent evidence, was not conclusive in Davis' favor that he did not act maliciously. The jury was not obliged to disregard all the other evidence in the case and take his statement as to his intention and purpose in displacing the fixtures of this track. Davis, having displaced the fixtures of the track, caused the derailment of the train and the death of Hambell, the law by presumption supplied the proof that Davis' conduct was actuated by malice; and if the evidence had afforded no explanation whatever of the motives which prompted Davis to do what he did, that presumption would have been conclusive that Davis acted maliciously. (*Preuit v. People*, 5 Neb., 377.) In *Davis v.*

*State*, 25 O. St., 369, it was said: "Where the fact of kill-
ing is proven, malice is to be presumed; and all the cir-
cumstances of justification, excuse, or extenuation must
be made out by the accused, unless they appear from the
evidence adduced against him." In *State v. Decklotts*, 19
Ia., 447, it is said: "Malice is presumed from the commis-
sion of an act wrongful in itself and without just cause
or excuse. Our statute has not altered the common law
requisites of murder. What was murder at common law
is still murder under our statute. The boundaries of the
field of this offense remain unchanged, but it is divided
into two degrees: murder in the first and murder in the
second degree. A specific intention to kill, to take life,
is not essential at common law to constitute murder; nor
is it essential, under our statute, to constitute murder in
the second degree." In *Wellar v. People*, 30 Mich., 16, it
was held: "To constitute murder the intent need not be to
take the life of the person killed, or even to inflict a per-
sonal injury upon him." In *Harris v. State*, 8 Tex.
App., 90, it is said: "When the fact of unlawful killing
is proved, and no evidence tends to show express malice
on the one hand, or any justification, excuse, or mitigation
on the other, the law implies malice, and the offense is
murder in the second degree." In *Beauchamp v. State*,
6 Blackf. [Ind.], 319, it is said: "Malice aforethought
means the intention to kill; and when such means are used
as are likely to produce death the legal presumption is
that death was intended." To the same effect see *People
v. Taylor*, 36 Cal., 255; *State v. Wisdom*, 84 Mo., 177; *People
v. Goslaw*, 14 Pac. Rep. [Cal.], 788; *Conn v. People*, 6 N. E.
Rep. [Ill.], 463. In *Mayes v. People*, 106 Ill., 306, Mayes,
in an angry and excited state of mind, threw a beer glass
at his wife. The glass struck a lamp which she was car-
rying, breaking the same and causing the oil therein to
take fire and burn her, from which she died. The su-
preme court said that it was immaterial whether Mayes
intended the glass should strike his wife or some other
person in the room, or whether he had no specific intent,

but acted from general malicious recklessness disregarding any and all consequences; in either case he was guilty of murder.  And the court held: "Where an act, unlawful in itself, is done with deliberation, and with intention of mischief or great bodily harm to some particular person, or of mischief indiscriminately, fall where it may, and death ensues from such act, against or beside the original intention of the party, it will be murder.  But when the act is unlawful, and manifests a reckless, murderous disposition on the part of the person charged, or, in the words of the old law book, 'A heart void of social duty, and fatally bent on mischief,' the presumption of law is that the mind assented to what the hand did with all the consequences resulting therefrom."  Therefore, when the jury came to consider the question as to whether Davis' conduct in the premises was actuated by malice, it had upon one hand the proof which the law furnished by presumption and all the facts and circumstances in evidence in the case, and upon the other hand it had Davis' statement as to his intentions and motives, and we cannot say that the jury reached a wrong conclusion in finding that Davis acted purposely and maliciously.

2. A second argument of counsel for Davis is that the district court erred in overruling his motion to be discharged from custody because more than three terms of court intervened between the time of the filing of the information against him and of his being placed on trial. The contention of counsel is that the information against Davis was filed at the September, 1894, term of the court; that there was a February, 1895, term, a May, 1895, term, and a September, 1895, term, at which latter term Davis was put on trial.  Section 390 of the Criminal Code provides that a person indicted for a crime and committed to prison who is not brought to trial before the end of the second term of the court having jurisdiction of the offense held after the indictment is found shall be entitled to be discharged.  And section 391 of the Criminal Code provides that a person indicted for an offense who has

given bail for his appearance, and who shall not be brought to trial before the end of the third term of court in which the cause is pending held after such indictment is found, shall be entitled to be discharged. The record shows that Davis was never admitted to bail, and therefore this motion is not based on said section 391. The motion, then, must have been based on the provisions of said section 390, and the discharge of the prisoner claimed upon the ground that more than two terms of court intervened between the filing of the information against him and the term at which he was put upon trial,—the word "three" in the motion having been used inadvertently instead of two; and since to so regard the motion would be to the prisoner's advantage, we will construe it as a motion to discharge because he was not placed on trial before the end of the second term of court held after the information was filed. The record shows that Davis was put on trial in March, 1895, the term which his counsel say was the February, 1895, term, and that the jury failed to agree; and it is not claimed but that the February, 1895, term of court was the first term of the court held after the term at which the indictment was found. If, then, the motion of the plaintiff in error is to be discharged because not brought to trial before the end of the second term of court after the term at which the indictment was found, there is no merit in the motion. If the sections of the Criminal Code just quoted are to be so construed as to entitle one under indictment for a crime and incarcerated to be discharged unless brought to trial before the end of the third term held after the term at which the indictment is found, still the motion was without merit, as the record shows that the prisoner was brought to trial, although the jury disagreed, at the first term of court held after the term at which the indictment was returned. Again, if, within the meaning of said sections of the Criminal Code, the prisoner was not "brought to trial" in March, 1895, because the jury failed to agree; and if, as counsel say, there was a May, 1895,

term of the court, still the prisoner would not be entitled to be discharged because not brought to trial until the September, 1895, term; because in computing terms of court mentioned in said section 391 the term of court at which the indictment was found is to be excluded. (*Whitner v. State*, 46 Neb., 144; *Korth v. State*, 46 Neb., 631.)

3. The third assignment of error is that the district court erred in refusing to give to the jury, at the request of the prisoner, the following instructions:

"28. The jury are instructed that if you believe from the evidence that any witness before testifying in this case has made any statement out of court concerning any of the material matters materially different and at variance with what he or she stated on the witness stand, then this jury are instructed by the court that these facts tend to impeach either the recollection or the truthfulness of such witness, and the jury should consider these facts in estimating the weight which ought to be given to his or her testimony.

"29. The jury are further instructed that if you believe from the evidence that any witness, before testifying in this case at this trial, had heretofore been a witness in this case at a former trial or at the coroner's inquest, and while under oath testified to any matters material to this case materially different and at variance with what he or she stated on the witness stand at this trial, then the jury are instructed by the court that these facts tend to impeach either the recollection or the truthfulness of such witness, and the jury should consider these facts in estimating the weight which ought to be given to such witness' testimony."

The maxim, "*Falsus in uno, falsus in omnibus*," is applicable alone where a witness has willfully testified falsely to a material fact. (*Buffalo County v. Van Sickle*, 16 Neb., 363; *Kay v. Noll*, 20 Neb., 380.) The foregoing requests were faulty and rightly refused, because they omitted the *scienter* that the witness willfully made a statement out

of court or testified on a former trial of a material matter substantially different from his testimony on the last trial.

4. A fourth assignment of error is that the court erred in refusing to give instructions Nos. 7 and 30 requested by the plaintiff in error. These instructions are substantially the same, No. 30 being as follows: "The jury are instructed that in weighing the testimony greater care should be used by the jury in relation to the testimony of persons who are interested in or employed to find evidence against the accused than in other cases, because of the natural and unavoidable tendency and bias of the mind of such persons to construe everything as evidence against the accused and disregard everything which does not tend to support their preconceived opinions of the matter in which they are engaged; and the jury are instructed that if any such persons have testified in this case, it is your duty to criticise such testimony more carefully than that given by witnesses who are wholly disinterested." This instruction is substantially like an instruction requested by the prisoner and refused by the district court in *Preuit v. People*, 5 Neb., 377, and in which case it was held that the instruction should have been given. But the ruling was placed upon the ground that the district court in that case had not in any other instruction given the substance of the one refused. In *Heldt v. State*, 20 Neb., 492, a detective, in the guise of a friend, induced a suspected person to confess to the commission of the crime. It was there held that the credibility of the detective was for the jury, but that the jury should be specially instructed to weigh his evidence with greater care than it would weigh the evidence of a wholly disinterested witness. We do not think, however, that the court erred in refusing to give the instruction under consideration in the case at bar, for the reasons: (1) The court gave the substance of what was proper of the instruction requested and refused in instruction No. 24 given on the court's own motion; and (2) because the

instruction requested was not applicable to the evidence. The record does not disclose that any witness who testified for the state was "interested in" or employed to find evidence against the prisoner. So far as the record shows, none of the witnesses were either informers or detectives.

5. The next contention of counsel for plaintiff in error is that section 93 of the Criminal Code, under which the prisoner was indicted and convicted, is invalid. The theory of counsel seems to be that since the purpose of the adoption of section 93 was to make the willful and malicious displacement of the fixtures of a railway track a felony, punishable by imprisonment in the penitentiary for not more than twenty years, that the legislature was without power to incorporate into said section the proviso that if such displacement of such fixtures should occasion the death of any one, the person displacing the fixtures should be guilty of murder in the first degree, second degree, or manslaughter, according to the nature of the offense. Counsel have not cited us to any provision of the constitution which this section 93 of the Code violates, and we are not aware of any such a provision. By the constitution of the state the legislature is invested with plenary legislative power, and the defining of crimes and prescribing punishment therefor is a legislative function. (*Hallenbeck v. Hahn*, 2 Neb., 377; *Hankins v. People*, 106 Ill., 628.) In Cooley's Constitutional Limitations [6th ed.], chapter 7, page 201, it is said: "The judiciary can only arrest the execution of a statute when it conflicts with the constitution. It cannot run a race of opinions upon points of right, reason, and expediency with the law-making power. Any legislative act which does not encroach upon the powers apportioned to the other departments of the government, being *prima facie* valid, must be enforced, unless restrictions upon the legislative authority can be pointed out in the constitution and the case is shown to come within them." It is no part of the duty of the courts to inquire

into the wisdom, the policy, or the justness of an act of the legislature.   Our duty is to ascertain and declare the intention of the legislature, and to give effect to the legislative will as expressed in the laws.   Every legislative act comes before this court surrounded with the presumption of constitutionality; and this presumption continues until the act under review clearly appears to contravene some provision of the constitution.   The courts are by the constitution not made critics of the legislature, but rather guardians of the constitution; and though the courts might have a doubt as to the constitutionality of the legislative act all such doubts must be resolved in favor of the law.

A second argument in support of the contention under consideration is that the proviso of said section 93 is void for uncertainty, because the crimes of murder in the first degree, murder in the second degree, and manslaughter are not defined in the proviso.   In support of this contention counsel cite us to *Johnston v. State*, 14 So. Rep. [Ala.], 629.   In that case a statute provided that one who should take away with intent to steal or hold for a reward a dog registered under the provisions of the act should, on conviction thereof, be punished as in other cases of larceny.   It appears that under the law of Alabama there were two classes of larceny,—grand and petit,—and that by the statutes of the state dogs were not property nor declared to be of any value.   The court admitted that it was competent for the legislature to make the taking and carrying away of dogs a crime of any nomenclature or degree, but held the statute void for uncertainty, for the reason that when a party was convicted under the statute the court was unable from the act to determine what judgment to pronounce,—whether to punish the convicted party for petit or grand larceny,—since the dog was not property and was of no value.   Another case cited by counsel for plaintiff in error in support of the contention under consideration is *State v. Gaster*, 12 So. Rep. [La.], 739.   A statute of that state denounced and

punished as a crime any civil officer guilty of "any mis-
demeanor in the execution of his office." The court held
that this statute was void for uncertainty, because it did
not on its face define what act should constitute a misde-
meanor, and that there was no other act in force which
did; and that in Louisiana all crimes were statutory.
The court also held that the act was unconstitutional
because it remitted the definition of "misdemeanor" to the
judiciary. But these authorities do not support the con-
tention of counsel. There is no uncertainty in the pro-
viso of said section 93. If one willfully and maliciously
displaces the fixtures of a railway track, and thereby
causes the death of another person, he is guilty of murder
in the first degree, if the evidence discloses that what he
did he did purposely and of his deliberate and premedi-
tated malice; and guilty of murder in the second degree
if the evidence discloses that he acted purposely and
maliciously, but without deliberation and premeditation;
and guilty of manslaughter though he acted without
malice and the killing was unintentional, since it re-
sulted from the displacement of the railway fixtures,
declared by the statute to be an unlawful act. It is for
the jury to say from the evidence which of these three
crimes, if either, the person accused has committed, and
this having been found, the court has but to pronounce
the judgment prescribed by other sections of the Crimi-
nal Code for the commission of such crime. A criminal
statute is not void for uncertainty which prescribes as a
punishment for the doing of a certain act the same pun-
ishment that is prescribed for doing another named act,
when the same criminal code defines the latter act and
prescribes its punishment.

6. The sixth assignment of error is that the court in-
formed the jury in his charge that the crimes of murder
in the first degree and murder in the second degree and
manslaughter were charged in each of the two counts of
the indictment on which Davis was tried; whereas, as a
matter of fact, only the first count of such indictment

charged him with murder in the first degree. The court did err in this respect, since only the first count of the indictment charged Davis with the crime of murder in the first degree. But the jury found Davis not guilty of murder in the first degree as charged in the first count of the indictment, and we are unable to see how this error of the court in making the statement he did was prejudicial to the plaintiff in error.

7. The seventh argument is that the court erred in defining the crime of murder in the first degree in its fourth instruction to the jury. We have examined this instruction and we do not think the court did err in defining therein the crime of murder in the first degree; and if it did, it was error without prejudice to Davis, as he was found not guilty of that crime.

8. The eighth assignment of error is that the court erred in giving instructions Nos. 5 and 6 of the instructions given on its own motion. These instructions are as follows:

"5. The statutes define murder in the second degree, and provide as follows: 'If any person shall purposely and maliciously, but without deliberation and premeditation, kill another party, such person shall be deemed guilty of murder in the second degree, and on conviction thereof shall be imprisoned in the penitentiary not less than ten years or during life, at the discretion of the court.'

"6. The statutes define manslaughter and provide as follows: 'If any person shall unlawfully kill another without malice, either upon a sudden quarrel or unintentionally, while the slayer is in the commission of an unlawful act, every such person shall be deemed guilty of manslaughter, and upon conviction thereof shall be imprisoned in the penitentiary not more than ten years nor less than one year.' "

The criticism made on these instructions is that the court did not say to the jury that they applied to either the first or second counts of the information. The court

had already told the jury with what crime Davis was charged in the first count of the information, and with what crime he was charged in the second count of the information; and in giving these instructions the court not only quoted the exact language of the statute, but stated the conclusions of fact which the jury must find in order to convict the plaintiff in error of either manslaughter or murder in the second degree. It was wholly unnecessary for the court to say to the jury, in so many words, that these instructions applied to the second count of the information. The district court had a right to presume that the jury was possessed of average intelligence; and the court having told the jury that Davis was charged in the second count of the indictment with murder in the second degree, in which charge was also embraced the charge of manslaughter, and then having instructed them what the law required to be proved in order to a conviction of murder in the second degree or of a conviction of manslaughter, he was not obliged to specifically say to the jury: These two instructions have reference only to the charge in the second count of the indictment. The jury would understand that without their attention being in this specific manner directed thereto.

9. We have already disposed of the ninth assignment of error by what we have said in the sixth, as the error of the court complained of in the ninth assignment consisted in stating to the jury that the second count of the indictment charged murder in the first degree.

10. The tenth assignment of error is that the court erred in giving instruction No. 8 of the instructions given to the jury on its own motion. The instruction is as follows: "You are instructed that in prosecutions on an information for murder in the first degree, if the evidence fails to sustain the charge of murder in the first degree the jury may, under such information, if the evidence shall justify and warrant it under the law now given you, find the defendant guilty of murder in the second degree

or manslaughter, as the case may be." Counsel for plaintiff in error, speaking of this instruction, say: "The objection to this instruction is that nowhere in the instruction has the court instructed the essential requirements of the statute to authorize the jury in finding the defendant guilty of murder in the second degree or manslaughter." These criticisms are unwarranted by the record. The court in the fourth instruction to the jury defined murder in the first degree, in the fifth instruction it defined murder in the second degree, and in the sixth instruction it defined manslaughter. The instruction was correct as a matter of law, and if the court had failed to give such instruction as this, it would probably have been reversible error, because the crimes of murder in the second degree and manslaughter are both included in the crime of murder in the first degree; and if Davis had been indicted only for the crime of murder in the first degree, the jury, if the evidence warranted it, might have found him guilty of the crime of manslaughter or murder in the second degree. The giving of this instruction was not prejudicial to the prisoner; on the contrary, it was intended to be and was to his advantage. In this connection counsel for the prisoner ask us to define the crimes of murder in the second degree and manslaughter as contemplated by section 93 of the Criminal Code. Counsel misunderstand this section of the Code. It does not define nor does it attempt a definition of murder in the second degree nor of manslaughter. Murder in the second degree is defined by section 4 of the Criminal Code and manslaughter is defined by section 5 of the Criminal Code; but section 93 of the Criminal Code simply declares that if one shall willfully and maliciously displace the fixtures of a railway track, and such displacement shall cause the death of a person, the person so displacing the fixtures shall be guilty of murder in the second degree, if the evidence warrants the conclusion that such person acted purposely and maliciously, and whether he was so actuated or not is a question of fact.

11. The eleventh argument is that the court erred in giving instruction No. 11 of the instructions given on its own motion. The instruction is as follows: "Deliberation and premeditaton are not elements of the crime of murder in the second degree, but malice is an essential ingredient of such a crime. To constitute murder in the second degree there must have been a willful killing done purposely and maliciously, but without deliberation and premeditation; but if the evidence establishes the fact that the killing was unlawful and was done with deliberate and premeditated malice, then the offense is murder in the first degree if the evidence further shows that the killing was intentionally, purposely, and unlawfully done." The first criticism on this instruction is that the court, in enumerating the essential ingredients of murder in the first degree, did not use the language of section 3 of the Criminal Code. This section provides that if any person shall purposely and of deliberate and premeditated malice kill another, etc.; while in the instruction complained of the court said that if the killing was unlawful and was done of deliberate and premeditated malice, then the offense was murder in the first degree if the evidence further showed that the killing was intentionally and purposely and maliciously done. We think that the language used by the court is substantially the language of the Code. The arrangement of the court's language is somewhat different from the arrangement of the language of the statute, but no sensible man could have been misled as to the meaning of the instruction. In *Long v. State*, 23 Neb., 33, it was held: "While it was advisable to use the statutory language descriptive of a crime in an instruction, yet, if the import of the words used in the instruction was the same as the statute, an instruction would not be held erroneous because the language employed by the court was different from the language of the statute." A second criticism of the instruction is that in it the court did not tell the jury that the fact that the killing was done purposely with delib-

erate and premeditated malice must be established beyond a reasonable doubt. The court had already explained to the jury the material allegations in each count of the indictment, and had told the jury that in order to a conviction of Davis under either count of the indictment it was incumbent upon the state to establish beyond a reasonable doubt each of the material allegations of such count. The court was not obliged to repeat in every instruction the degree of proof required, since the jury had been told that the state must make out its whole case beyond a reasonable doubt. (*Carleton v. State*, 43 Neb., 373.)

12. The twelfth argument is that the court erred in giving instruction No. 21 of the instructions given on its own motion. It is as follows: "Where circumstances alone are relied upon for conviction the rule of law is, to warrant a conviction, such a state of facts and circumstances must be shown that they are all consistent with the guilt of the defendant, and such as cannot upon any reasonable theory and hypothesis be true and the defendant be innocent; and in this case this rule should be applied by the jury to that portion of the evidence offered by the state wholly of a circumstantial nature, and if the jury find from the evidence that all the incriminating circumstances upon which the prosecution relies for a conviction will as well apply to some other person or persons as to the defendant, or if such facts and circumstances are reconcilable with any reasonable theory or hypothesis other than the guilt of the defendant, or if such facts and circumstances, together with the direct evidence offered in this case, do not satisfy the minds of the jury beyond any reasonable doubt of the guilt of the defendant, then you should by your verdict acquit him." The criticism made upon this instruction is the use by the district court of the phrase "incriminating circumstances." "Incriminate" means to charge with a crime, and an incriminating circumstance is one which tends to show that a crime has been committed, or that some particular person committed it. An instruction should be examined as a whole. All that the

instruction contains should be looked to for the purpose of determining whether the party complaining of it was prejudiced by it.  To single out a phrase, a word, or a sentence from an instruction and to examine such word or phrase separately from the other parts of the instruction is not a fair method of criticism.  In the case at bar the state had introduced in evidence a number of circumstances which tended to show that the fixtures of the railway track of the Rock Island railway had been removed; that in consequence thereof a passenger train had been derailed and in consequence of this said Hambell and others were killed; and that Davis removed these fixtures.  An analysis of the instruction under consideration shows that the court, mindful of the presumption of the innocence with which the law surrounded the prisoner, by it, for the prisoner's benefit, cautioned the jury against a hasty conclusion of the guilt of the prisoner by reason of the circumstances in evidence.  The court in the first sentence of the instruction told the jury that to warrant the conviction of Davis upon circumstantial evidence not only must the circumstances be consistent with his guilt, but that they must be such as could not upon reasonable theory be true and Davis be innocent. In the second sentence the court told the jury to apply that rule to the circumstantial evidence in the case produced by the state, and if they should find that all the circumstances offered in evidence by the state which tended to show that a crime had been committed and that Davis committed the crime would apply as well to some other person as to Davis, or if this evidence was reconcilable with any reasonable theory other than the guilt of Davis, or if this evidence, when taken in connection with the other evidence in the case, did not convince them beyond a reasonable doubt that Davis was guilty, they should acquit him.  When all parts of this instruction are considered together it turns out to be an instruction very favorable for the prisoner, and it would require a stretch of the imagination to conclude that Davis was

prejudiced by the giving of the instruction even if the court should not have used the term "incriminating circumstances." The instruction is in substance the same as instructions 1, 8, 9, 10, and 11 which the prisoner requested the court to give in his behalf. To adopt the theory of counsel for the prisoner here and hold that this conviction should be reversed because the court used the phrase "incriminating circumstances" in the manner and in the connection in which it used it, would be to lay down a rule which would make it practicably impossible for a district court to safely instruct a jury in a criminal case. It never was the intention of the law that the district judges of the state should abdicate their reason because a man was on trial charged with the commission of a crime; nor does the law of the land place the district judges in a strait-jacket in criminal trials, nor make of them mere machines to repeat certain general propositions of law in their instructions. *Metz v. State*, 46 Neb., 547, is relied on here by counsel for Davis as an authority for counsel's contention that the use by the district court of the phrase quoted is reversible error. But the Metz case does not sustain the contention made here. In that case Metz was on trial charged with the crime of burglary of a storehouse, or warehouse, and the larceny of certain corn therefrom. Under his plea of not guilty, in order to his conviction, it was necessary for the state to prove first that a burglary and larceny had been committed, and second that Metz was the person who committed the crime. The court instructed the jury as follows: "If you believe from the evidence, beyond a reasonable doubt, that soon after the burglary of the storehouse, or warehouse * * * and the larceny of the corn therefrom, a portion of the said corn so stolen was in the exclusive possession of the defendant George Metz, you are instructed that this circumstance, if so proven, is presumptive, but not conclusive, evidence of the defendant's guilt." Reviewing that instruction, we said that it was

erroneous because by it the court assumed that a burglary
and larceny had been committed, and this took away from
the jury one of the material allegations of the indictment
which it was incumbent upon the state to prove, viz., that
the burglary and larceny had been committed. But the
district court in this case, by using the phrase "incrimi-
nating circumstances," did not assume either that a crime
had been committed, or that Davis had committed it.

13 and 14. The thirteenth and fourteenth assignments
of error are directed to instructions 22 and 23 of the in-
structions given by the court upon its own motion. By
these instructions the attention of the jury was directed
to the evidence of certain admissions made by Davis and
told that they should give to the evidence of such state-
ments and admissions the weight and consideration to
which they deemed it entitled. The only criticism upon
the instructions is that the court did not instruct the jury
that unless they believed the evidence as to the admis-
sions and statements made by Davis beyond a reasonable
doubt they should acquit him. The criticism is without
merit. The court had already fully and fairly, and in
language which no man of average intelligence could mis-
understand, instructed the jury that every doubt was to
be resolved in favor of Davis, and that the state, in order
to convict him upon either count of the indictment, must
establish every material allegation of such count beyond
a reasonable doubt. To use the term "reasonable doubt"
or "beyond a reasonable doubt" in every instruction in
which evidence was referred to was not only unnecessary,
but might have tended to obscure that which the district
court sought to make plain.

15. The subject-matter of sections 668a to 668n, both
inclusive, of the Code of Civil Procedure, is grand and
petit jurors in counties having a population of seventy
thousand inhabitants or more. These sections provide
when, how, and from what class of citizens grand and
petit jurors for such counties shall be selected and drawn.
It appears from the record before us that prior to the Sep-

tember, 1895, term of the district court of Lancaster
county, the regular panel of petit jurors to serve at such
term of court was drawn, selected, and summoned as pro-
vided by said sections of the statute; that in making up
the jury to try the defendant at that term of court the
regular panel so summoned was exhausted and a special
panel was summoned in pursuance of said sections of the
Code.    From the regular and special panels so summoned
a jury was selected, before whom Davis was placed upon
trial.    The trial proceeded for some days, when one of the
jurymen became sick and was found, by a commission ap-
pointed by the court, to be insane, and thereupon, on the
13th day of November, the court discharged the jury and
set down the trial of Davis' case for the 15th of said month.
The record then recites: "And thereupon the court, being
convinced that a jury cannot be obtained from the regular
panel, and the special panel already drawn being ex-
hausted, it is therefore ordered that there shall be drawn
and summoned in the manner provided by law two hun-
dred and ten (210) qualified persons as a second special
panel, to report November 15, A. D. 1895, at 9 o'clock
A. M., as petit jurors to serve on this case."    These 210
men were summoned in pursuance of the provisions of
said section of the Code, and from their number another
jury was selected, which tried and convicted Davis.    The
fifteenth argument of counsel for Davis is that by this
action of the court their client was deprived of a trial by
the regular panel of petit jurors.    The contention is with-
out the slightest merit.    In the first place, Davis was
present in court when the jury was discharged because of
one of its members becoming insane, when his case was
continued and set for trial on the 15th of November, and
when the court made the order for the summoning of 210
persons from whom to select a jury.    He interposed no
objection whatever to any of these proceedings.    In the
second place, the selection of grand and petit jurors for
the county of Lancaster is governed by the said sections
of the Civil Code mentioned above.    Section 668*g* ex-

pressly provides: "That whenever there shall be pending for trial in said court any criminal cause wherein the defendant is charged with a felony, and the judge holding such court shall be convinced from the circumstances of the case that a jury cannot be obtained from the regular panel to try said cause, such judge may, in his discretion, prior to the day fixed for the trial of said cause, direct the clerk to draw (in the same manner as the regular panel is drawn) such number as the judge may direct, as a special panel from which a jury may be selected to try said cause, which panel shall be notified and summoned for said day the same as the regular panel." Davis was not denied a trial by the regular panel of petit jurors called for the September, 1895, term of court. That panel was exhausted in the selection of the first jury and a special panel summoned to complete the first jury, and when that jury was discharged because of the insanity of one of its members the court was by the statute invested with authority to cause to be summoned the second special panel, which it did. When the selection of the second jury began from the second special panel the court did not err nor deprive Davis of any right by not causing the regular September panel that had been examined and exhausted to be recalled and re-examined. Certainly this is true in the absence of any request or demand by Davis that the exhausted regular panel should be recalled.

16. The state called one Cobb as a witness, who testified to his acquaintance with Davis; that Davis had been working for him for some months and had left his employ on the 14th of March, 1894. He was then asked to state what, if any, peculiarities Davis had, and, over objections of the defendant, he answered, in substance, that Davis was superstitious; that he regarded Thursday as a lucky day for him, and that whatever he was about to undertake he preferred to begin on Thursday. The admission of this evidence is the next assignment of error presented for consideration. The evidence showed that the wreck in which Hambell was killed occurred on a

Thursday, and the circumstances tended to show that Davis caused the wreck by displacing the fixtures of the railway track; that prior to the wreck he had said that the place where the wreck occurred was a favorable one for causing a wreck; that he was tired of farming and that the railroad company must give him a job, and that his motive in displacing the fixtures was to procure railway employment or a reward. The evidence then objected to was not incompetent. The superstition or belief of Davis that Thursday was a lucky day for him, that anything he attempted upon that day would succeed, was a circumstance competent for consideration by the jury in connection with all other circumstances and evidence in the case tending to identify Davis as the man who displaced the fixtures of the railway track.

17. One Rosenthall, a passenger upon the train at the time it was wrecked, a showman traveling about the country exhibiting a giant, was called as a witness for the state. It appears that he was in court and testified on the trial which failed because of the insanity of a juror, and after that jury was discharged, and before the case came on for trial again, he returned to Kansas City. He came back to the last trial, was examined by the state, and on cross-examination by the defendant he was asked:

Q. You live in Kansas City?

A. Yes; sir.

Q. You have been there all the time?

A. No, sir; I am traveling around.

Q. Did you go home last week?

A. Yes, sir.

Q. What road?

The state objected to this and the court sustained the objection. Counsel for Davis then offered to prove by the witness that he went from Lincoln to Kansas City over the road of the Rock Island Railway Company and returned by that road from Kansas City to Lincoln without expense to himself. In other words, the offer to prove was that the Rock Island Railway Company fur-

nished the witness free transportation from Lincoln to
Kansas City and return. The court excluded the offer
and this ruling is the next argument here. It is true that
a litigant has the right to cross-examine a witness pro-
duced against him to show the interest, bias, or prejudice
of such witness, but the extent to which such a cross-
examination may be carried is a matter resting very
largely in the sound discretion of the trial court. (*Con-
saul v. Sheldon*, 35 Neb., 247.) Doubtless there may be
cases in which such a cross-examination should be al-
lowed to take a very wide range, while in other cases such
a cross-examination may properly be limited. Each case
depends upon its own circumstances, including the dis-
position, temperament, and conduct of the witness on the
stand. But a case will not be reversed because of a limi-
tation placed by the court upon the cross-examination
of a witness as to his interest or bias, unless it appears
from the record that the party against whom this witness
was called was probably prejudiced by such limitation.
We do not think the court would have abused its dis-
cretion had it permitted the witness to answer the ques-
tion asked him; and we are quite clear that the court did
not abuse its discretion in refusing to permit the witness
to answer. The cross-examination of this witness was a
very lengthy one, and failed to disclose that he had any
interest in the result of this suit, or any bias or prejudice
for or against the defendant. The ostensible object of the
question put by counsel for Davis was to show that the
witness for the Rock Island Railway Company was tak-
ing an interest in the prosecution of Davis; but its real
object was a very different one, viz., to have the jury un-
derstand that the Rock Island Railway Company was
furnishing free transportation to this witness in order
that he might appear and testify in this case against the
prisoner, and thereby awaken the prejudices of the jury,
in the hope that it might take the view that the real
prosecutor of Davis was not the state of Nebraska, but a
powerful and wealthy corporation. We have already

said that we do not think the court would have abused its discretion had it permitted the witness to answer the question, nor do we.  For if the Rock Island Railway Company furnished this witness free transportation from his place of residence to the place of trial, that was not a matter which even tended to show that the witness was unduly interested in prosecuting Davis or biased against him. The property of this railway company had been destroyed.  A great crime had been committed through the displacement of the fixtures of its track, and the railway company should have been, if it was not, interested in finding out the perpetrator of this crime and in bringing him to punishment.  Its duty in that respect was like that of every other citizen of the state.

18.  One Lonsdale was called as a witness for the state and testified to a conversation which occurred between him and Davis in the presence of a man named Enlow. This conversation occurred within a day or two after the wreck, and in this conversation Davis explained that he thought the wreck was caused by the fixtures of the track having been removed; while Lonsdale expressed his opinion to the effect that he thought the wreck resulted from the spreading of the rails, and that one man could not have displaced the fixtures.  This witness was cross-examined at length by Davis' counsel and was asked the following questions:

Q.  What did Enlow say?

Q.  Why did you not think a man could not do that? [That is, not displace the fixtures.]

Q.  The fact is, you do not remember much about that, do you?  [That is, what witness told Davis in the conversation.]

The court, on motion of the state, refused to permit the witness to answer these questions, and this ruling is the next assignment of error argued here.  It appears that counsel for the state gave no reasons for objecting to the questions and it is insisted that the court, without a reason being given, had no right to sustain the objections.

We do not agree to the proposition that a district court must permit every question asked to be answered unless, when objected to, a proper reason is given for such objection. We think that a trial court may on its own motion, refuse to permit a witness to answer a question if such question calls for incompetent, immaterial, or irrelevant evidence. The first question required the witness to testify as to what some other witness had said. This called for incompetent and hearsay evidence. The other two questions were immaterial, and the court did not err in sustaining the objections to each of the questions.

19. The next assignment of error relates to the ruling of the court in refusing to permit the witness Lonsdale to answer whether he had talked over the facts in the case on trial with one Billingsley and one Greene. Counsel in their brief here say that Billingsley and Greene were attorneys for the Rock Island Railway Company, and that that corporation and its attorneys had taken a prominent part in the prosecution of their client and that the object of the questions propounded to the witness Lonsdale was to ascertain if he had been unduly interested or influenced as a witness by the railway company or its attorneys. If the trial court was aware that the object of the questions was to ascertain the interest or bias of the witness, then it was a matter in the discretion of the trial court to say how far that cross-examination might be conducted, and on that theory the record does not disclose that the court abused its discretion in limiting the cross-examination. As a matter of fact the record shows that the witness answered that he had never talked with Billingsley about the case; that he had talked with hundreds of people about it, among others, an officer or officers of the Rock Island Railway Company, so that, in any view we take of the assignment under consideration, the plaintiff in error was not prejudiced by the action of the trial court.

20. The state called as a witness one Daniel Sullivan, who testified to having been for twenty-three years in

railroad business, having worked upon railroads in Canada and the United States, and generally to being an experienced railroad trackman. He then testified that he resided in Lincoln and had lived there for fifteen years, and that about 7 o'clock on the morning after the wreck he went to the place thereof, on his own motion, for the purpose of examining and ascertaining the cause of the wreck. The state then asked him this question: "Mr. Sullivan, tell the jury what investigation you made and what you found as to the causes of that wreck." The plaintiff in error objected to this question as incompetent, irrelevant, and immaterial. The objection was overruled and the witness answered at length as to what examination he made and what he saw. Among other things, he stated that he saw fresh marks upon the ties where the car wheels had struck them after they left the rails; the fresh marks of a wrench upon the nuts of the bolts which held the rails together; the fresh holes left where the spikes had been pulled from the ties; some spikes where the heads had been recently pulled off in attempting to remove the spikes; the marks of the clawbar that had been used in removing the fixtures. It is now insisted that the court erred in permitting this question to be answered, and it is argued that by the question the witness was required to state what caused the wreck. We do not think so. But if the question is open to that criticism the plaintiff in error was not prejudiced by the answer of the witness, as he expressed no opinion as to the cause of the wreck, but simply stated what he saw and what he learned.

21. One Tyrer was called as a witness for the state and testified that he was then living and had for several years lived with one Lonsdale. On cross-examination Davis' counsel asked him this question: "You know that Lonsdale is expecting a reward in this case in case Davis is convicted?" On objection of the state the court refused to permit this question to be answered, and this is the next assignment of error argued here. The court

did not err in refusing to permit this question to be answered. It would have been proper to ask Lonsdale, who had also testified as a witness for the state, on his cross-examination, if he was expecting a reward in case Davis should be convicted, for the purpose of showing his interest in the result of the prosecution. But it was not proper to show this fact by the cross-examination of some other witness. Davis' counsel did not show, nor attempt to show, by Lonsdale when they cross-examined him that he was expecting a reward in case of Davis' conviction. We do not understand that it is competent to prove the interest or bias or prejudice of one witness by the cross-examination of another witness without at least first having cross-examined the first witness as to his interest, bias, or prejudice.

22. While the witness Tyrer was being cross-examined by counsel for Davis as to a conversation which the witness had had with Davis prior to the wreck, counsel asked him these questions:

Q. What were the exact words? [That is, the exact words of the conversation between the witness and Davis.]

A. He said, farming does not agree with me and the railroad will have to do something for me.

Q. What railroad, if any, did he say would have to do something for him?

A. He didn't say.

Q. Didn't he say the Rock Island?

A. No, sir.

Counsel for Davis then moved the court to strike from the record the answers made by the witness to the questions they had propounded. The overruling of this motion is the next assignment of error argued. The answers were responsive to the questions, and we have never before heard that counsel might propound a question to a witness, have the witness furnish an answer responsive to the question, and then demand of the court as a matter of right to strike out the answer made. If counsel did

not wish the exact language that Davis used in his conversation with Tyrer they should not have asked for it. Having propounded the question, and having obtained an answer responsive thereto, counsel are in no position to complain of the action of the court in refusing to expunge the answer from the record.

23. One Shouse was called and examined as a witness for the state and identified the claw-bar which the state claimed had been used in displacing the fixtures of the railway track. He testified that he at that time lived in the city of Lincoln; that he was at that time working on the track of the Missouri Pacific Railway; that in the years 1892, 1893, and 1894 he was working on the track of the Northwestern railway system; that he had never worked for the Rock Island Railroad; that the claw-bar in question was in his possession from 1887 until October, 1893, at which time he lost it, or it was stolen from him; that the first time he saw it after October, 1893, was at the coroner's inquest held after the wreck; that while it was in his possession he had had it repaired some two or three times. He was cross-examined by counsel for Davis as follows:

Q. Didn't one of the men that fixed it [the claw-bar] live at Ashland?

A. No, sir.

Q. Didn't you testify the other day that he did?

A. No, sir; not that I know of.

Q. Do you know Mr. Altschuler?   [One of the counsel for Davis.]

A. I have heard of him.

Q. Don't you know him?

A. Only as I see him.

He was then asked if he did not tell Altschuler at a certain time and place that one of the men who had repaired the claw-bar lived at Ashland and that the last time he saw the claw-bar it was in the possession of the Rock Island Railway Company. He answered: "No, sir; I never saw it in the possession of the Rock Island Company."

Q. Didn't you tell Mr. Altschuler that?

A. No, sir.

Q. Or words in substance that?

A. No, sir.

Q. Didn't you go with Mr. Altschuler and all three of you go up to Altschuler's office at that time?

A. Upstairs?

Q. Yes, sir.

A. No, sir; I didn't.

Q. You have been in Mr. Altschuler's office?

A. Yes, sir.

Q. How many times?

A. Once.

Q. In his office?

A. I went to the edge of the door.

Q. Didn't you go into the office with him and have a conversation with him about this bar?

A. No, sir; I didn't. I went up to the dentist's office.

Q. I will ask you if you didn't go in there two or three times after that and inquire for Mr. Altschuler?

A. No, sir.

Q. Of Mr. Eager?

A. No, sir.

Q. No time after that?

The court, on the objection of the state, refused to permit the witness to answer this last question.

Q. You have been taking considerable interest in this case?

A. No, sir.

Q. You testified the other day about the condition of the wreck, didn't you?

This last question the court also refused to permit the witness to answer. The action of the court in refusing to permit the witness to answer these two questions is the next assignment of error argued by counsel for Davis. The witness denied telling Altschuler that the man who repaired the claw-bar lived at Ashland and denied telling Altschuler that the first time he saw the claw-bar after

October, 1893, it was in the possession of the Rock Island Railway Company, and that he had ever told Altschuler so, either in so many words or in substance; that he had ever been in Altschuler's office but once, and then only went to the edge of the door.  If the object, then, of the first of these two questions was to lay a foundation for impeaching the witness, that foundation was sufficiently laid, and the court did not abuse its discretion in refusing to permit the cross-examination to be further extended. As to the second question objected to, if the object of this was to show that the witness on a former trial had testified to something in reference to the wreck different from what he had testified at the present trial and thus lay the foundation for impeaching him, counsel should have asked him whether or not he testified to certain specific things on that trial.  They did not do this, and we cannot see how their client was prejudiced by the refusal of the court to permit the witness to say whether or not he had testified on a former trial as to the condition of the wreck.

24. The next assignment of error argued is that the court erred in striking out the evidence of one Ringer, a witness who was called and sworn on behalf of the defense.  This witness testified that he visited, on the 4th of November, 1895, the place where the wreck occurred. He then detailed the condition of the track and the trestle where the wreck occurred as it was at the time he made his visit.  He had never been to the place of the wreck before this time.  We are unable to determine from the record whether the court sustained the motion of the state to strike out all of this evidence.  The court did sustain the motion to strike out the answer to the last question made to the witness.  That was a question propounded by the court.  The record then discloses that the state moved to strike out all the evidence of the witness, and that the court overruled the motion.  We assume, however, for the purposes of the assignment under consideration, that the court did sustain the state's mo-

tion to strike out all the evidence of this witness, and if he did so his ruling was correct. The evidence shows that soon after the wreck occurred the trestle and track were repaired and the trains began running as usual. This witness had never seen this track or trestle until fifteen months after the wreck occurred, and in the absence of evidence which at least tended to show that the track and trestle were in the same condition on the 4th of November, 1895, that they were immediately prior to the wreck, or immediately afterwards, the evidence was incompetent.

25. One Spelts was also called as a witness for the defendant, and testified that he lived about three-quarters of a mile from the place where the wreck occurred; that he had been over that trestle several times before the wreck; that he passed there some two or three weeks before the wreck; that he knew the claim was that the wreck was not caused by the displacement of a rail; that he could not say that he had ever noticed that rail; that he had noticed the end of the trestle. He was then asked to state what he saw or noticed the time he passed there some three weeks before the occurrence of the wreck. The refusal of the court to permit this question to be answered is the next assignment of error argued here. The theory of the defense was that the wreck was not caused by the displacement of the fixtures of the track by Davis, but by defective construction of the trestle and track, or its being out of repair. Any and all evidence which tended to show the condition of this track and trestle at the time of the wreck, immediately before, or after that time, was competent. Counsel did not attempt or offer to show by this witness that there was any defect of construction in either the track or trestle, and we cannot say that the court erred in refusing to permit the witness to state what he saw or observed as to the condition of this track and trestle three weeks before the time of the wreck.

26. Rokeby is a station on the Rock Island Railroad

between the cities of Lincoln and Fairbury.   One Young, the Rock Island Railway Company's agent at said station, was called as a witness for the state and testified that the wrecked train left Rokeby at twenty-two minutes after 9 o'clock in the evening.   He was then cross-examined by counsel for Davis and asked whether he testified from his recollection or from the record kept of passing trains, and he answered that he testified from the record.   Counsel for Davis then moved to strike out the testimony of the witness, and the overruling of this motion by the court is the next argument here.   The record itself, the proper foundation having been laid, was competent evidence to prove the time at which the wrecked train left Rokeby.   (*Imhoff v. Richards*, 48 Neb., 590.)   But the record does not disclose that the witness, in testifying as to the time when the wrecked train left Rokeby, was reading from his train record, but the effect of his evidence is that he remembered the time it left because he had consulted his train record.   Since the witness had made the entry in the train record,—made it at the time the event recorded occurred,—it was competent for him to consult this record before testifying for the purpose of refreshing his memory.   (*Anderson v. Imhoff*, 34 Neb., 335.)   But whether this ruling of the court was right or wrong, the plaintiff in error is in no position to complain of it, as the bill of exceptions discloses that the entry in the train record corresponded exactly to the testimony of the witness; and this train record, this entry, the plaintiff in error himself offered in evidence to the jury.

27. It will be remembered that when the state's witness Shouse was being cross-examined he was asked whether, at a certain time and place, he did not tell Altschuler that the man who mended the claw-bar lived at Ashland, and that the first time he saw the claw-bar after October, 1893, it was in the possession of the Rock Island Railway Company; and that Shouse denied making such statements to Altschuler.   He was also asked if he did

not go up to Altschuler's office two or three times inquiring for him, and that he testified that he did not. One Eager was called as a witness for the plaintiff in error and testified that he was an attorney at law living in the city of Lincoln, and kept his office with Altschuler; that he was acquainted with the witness Shouse. Counsel for Davis then offered to prove by Eager that he had seen the witness Shouse at Altschuler's office inquiring for the latter two or three times before the trial. The refusal of the court to admit this evidence is the next argument here. Counsel for Davis made no effort to show by the witness Eager that Shouse ever had the conversation with Altschuler which he denied having, or ever made the statements to Altschuler which he denied making as to the claw-bar being repaired at Ashland and being seen by him the first time after October, 1893, in the possession of the Rock Island Railway Company, and the trial court held, in effect, that the proof offered was immaterial, unless in connection with proof or offer of proof to show that Shouse had made the statements to Altschuler which he had denied making; and in this ruling we think the district court was correct. Shouse having denied telling Altschuler that one of the men who repaired the claw-bar lived in Ashland and that the first time he saw the claw-bar after October, 1893, it was in the possession of the Rock Island Railway Company, it would have been competent for the defendant to prove by the witness Eager that in his presence Shouse did make such statements to Altschuler; but in the absence of making that proof, or of any effort or intention to furnish that proof, the single fact whether Eager had seen Shouse at Altschuler's office inquiring for the latter was wholly immaterial. (*Johnston v. Spencer*, 51 Neb., 198.)

28, 29, 30, and 31. The next four assignments may be considered together. They are to the effect that the court erred in permitting the state to introduce in rebuttal certain evidence. The contention is that the evidence introduced was a part of the state's case in chief—that it

was not rebuttal evidence. It would subserve no useful purpose to quote this evidence here. We have carefully examined it all, and we have not the slightest doubt that all the evidence about which complaint is here made was competent evidence and was competent in rebuttal. Furthermore, if any of this evidence should have been introduced by the state in making out its case in chief, the record does not disclose that the court abused its discretion in permitting it to be put in as rebuttal testimony. The order in which a party shall introduce his proof is to a great extent discretionary with the trial court and its action in that respect will not be cause for reversal when no abuse of discretion is shown. (*Basye v. State,* 45 Neb., 261, and cases there cited.)

32. The record before us discloses that the prisoner was arraigned and pleaded not guilty and put on trial before a jury November 6, 1895, in the Lancaster county district court; that after the taking of testimony had proceeded for some days a juror became sick; that the court appointed a commission to examine the juror and this commission found the juror insane and so reported to the court; that thereupon and for that reason the court discharged the jury and caused the case to be set down for trial on the 15th of November, 1895. The prisoner was in court when all these proceedings were had and neither objected nor consented to any of them. On the 15th of November the selection of the jury which convicted Davis began, he making no objection to the selection of such jury. After this jury was selected and sworn, and before the taking of testimony began, Davis filed what he denominates a "plea of former jeopardy," in which he alleged that on the 6th of November, 1895, he was brought to trial in the Lancaster county district court upon the same information upon which he was about then to be tried; that he pleaded not guilty to that information; that a jury was thereupon called and sworn in the case and he was put upon trial on said information under a plea of not guilty thereto; that witnesses were called and sworn

and evidence submitted to the jury on behalf of the state and thereupon, "without the knowledge, consent, or connivance of this defendant, and without legal cause therefor, the said jury was discharged." He further alleged that the offense charged in the first information was the same offense charged in the information on which he was about to be tried; that the two informations were the same. By reason of the facts alleged the prisoner claimed that he ought to be discharged; and he then demanded of the court a jury for the trial of the facts stated in said so-called plea of former jeopardy. The district court denied the request for such jury trial and on its own motion overruled and disregarded the so-called plea of former jeopardy. These actions of the court constitute the next assignment of error argued here. We shall for a moment, and for the purposes of the argument under consideration only, regard this plea of former jeopardy as a valid plea in bar within the meaning of the Code of Criminal Procedure of this state.

In *Korth v. State*, 46 Neb., 631, Korth pleaded not guilty on the general issue to the indictment against him and afterwards, without withdrawing such plea, he filed a plea alleging that more than four terms of court had intervened between the term of court at which the indictment was found and the term at which he was brought to trial thereon, and claimed the right to be discharged. This plea the district court, on its own motion, struck from the files, or overruled; and this court held that so long as the plea of not guilty remained on the record the plea made by Korth was not proper.

Section 447 of the Code of Criminal Procedure provides that after a demurrer to an indictment has been overruled the accused may plead not guilty or in bar; and section 448 of that Code provides that the accused shall be arraigned by reading to him the indictment, etc. And section 449 provides that the accused may then—that is, after he has been arraigned and the indictment read to him—offer a plea in bar, etc.; and section 451 of said Code

provides that if the issue on a plea in bar be found against the defendant, or if upon his arraignment he offers no plea in bar, then he shall plead guilty or not guilty, and if he pleads evasively or stands mute he shall be taken to have pleaded not guilty. We think the true construction of these provisions of the Criminal Code is that there can never be more than one issue before the court in a criminal case at one time; and that so long as the plea of not guilty remains on the record a plea in bar is improper; that the state is under no necessity of replying or demurring to such plea, and that the court on its own motion may disregard it. This point was presented to this court, and ruled as we have just stated it, in *Marshall v. State*, 6 Neb., 120. In other words, a plea in bar will not lie while there is of record a plea of not guilty, unless the latter plea be withdrawn; and it seems to be a matter left by the law to the sound discretion of the trial court whether he will permit a prisoner to withdraw a plea of not guilty and file a plea in bar. We have no doubt, however, that if a prisoner, after a plea of not guilty, tenders a lawful and proper plea in bar, stating facts which have occurred or come to his knowledge since the entry of his plea of not guilty, and which facts if true would entitle him to a discharge, then it would be the duty of the court to permit the prisoner to withdraw his plea of not guilty and file the plea in bar. (*State v. Salge*, 2 Nev., 321.)

Again, section 450 of the Code of Criminal Procedure provides: "No plea in bar or abatement shall be received by the court unless it be in writing, signed by the accused, and sworn to before some competent officer." The so-called plea under consideration was in writing, but it was not signed by Davis, nor was it sworn to. It was, therefore, invalid as a plea in bar. The state was under no obligation to demur or reply to it, and the court would have been justified in entirely disregarding it or on its own motion striking it from the files. Of course, if this had been a valid plea in bar within the meaning of the

Code of Criminal Procedure,—if it had been a good plea,
stating the facts upon which the prisoner relied,—then
the prisoner would have had the right to compel the
state to join issue upon this plea either by demurrer or
by replication, and if the state joined issue by replica-
tion the prisoner would have been entitled to a jury to
try the issue so made. (*Arnold v. State*, 38 Neb., 752;
*Smith v. State*, 42 Neb., 356.)    But not only was the plea
invalid because not signed and sworn to by the prisoner,
but the plea did not set out the record of the actions and
omissions of the court which the prisoner claimed en-
titled him to a discharge.    It did not even avouch such
record, and it is at least doubtful, if the plea had been in
all other respects sufficient, whether it stated such facts
as required the state to take issue upon it.    Whether it
did or not it is not necessary for us now to decide, nor
do we decide that point.    As to what a plea in bar should
state see *Priest v. State*, 10 Neb., 393; *State v. Blamut*, 2
S. W. Rep. [Ark.], 190; *State v. Emery*, 7 Atl. Rep. [Vt.],
129; *Williams v. State*, 13 Tex. App., 285.

It seems to be the rule that a plea of former jeopardy
should set out the record,—that is, the former indictment
and acquittal or conviction and the statement of facts;
viz., the identity of the person acquitted or convicted and
the offense of which he was acquitted or convicted.    But
while this so-called plea of former jeopardy, for reasons
already stated, cannot be examined or considered as a
plea in bar, we think it should be regarded as a motion
made by the prisoner to be discharged from further pros-
ecution grounded on the actions and ruling of the court
in the case as disclosed by the record; and treating it
as a motion we proceed to inquire whether the prisoner,
under the facts stated in the record, had already been
once in jeopardy, and whether the court, with these facts
on record before it, erred in not so holding and discharg-
ing the prisoner.    Section 485 of the Code of Criminal
Procedure provides: "In case a jury shall be discharged
on account of sickness of a juror, or other accident or

calamity requiring their discharge, or after they have
been kept so long together that there is no probability of
agreeing, the court shall, upon directing the discharge,
order that the reasons for such discharge shall be en-
tered upon the journal; and such discharge shall be with-
out prejudice to the prosecution." When the district
court discharged the jury first impaneled to try Davis be-
cause of the insanity of one of its members he entered
or caused to be entered upon the record all the facts
which caused him to so discharge the jury, and he made
such discharge without prejudice to a future prosecution
of the case. It would seem that the insanity of a juror
is an accident or calamity requiring the discharge of a
jury within the meaning of said section of the Criminal
Code.

In *State v. Hall*, 9 N. J. Law, 256, after the jury was
sworn in a criminal case and departed from the room,
one of the jurors separated from his fellows and went
home. Thereupon the court, without the consent of the
defendant, discharged the jury, and it was held that the
discharge of the jury was not a bar to the prisoner's
further prosecution.

In *United States v. Perez*, 22 U. S., 579, a capital case,
the jury was discharged without the consent of the pris-
oner because they were unable to agree upon a verdict.
The court held that this discharge did not bar the further
prosecution of the prisoner upon the indictment. The
court said: "We think that in all cases of this nature the
law has invested courts of justice with the authority to
discharge a jury from giving any verdict whenever in
their opinion (that is, the court's opinion), taking all the
circumstances into consideration, there is a manifest
necessity for the act, or the ends of public justice would
otherwise be defeated."

In *State v. Emery*, 7 Atl. Rep. [Vt.], 129, a jury in a
criminal case was discharged before verdict because one
of the jurors was taken sick and unable to proceed with
the trial, and the court held that the discharge of the jury

under such circumstances did not bar the further prosecution of the prisoner.

In *McFadden v. Commonwealth*, 23 Pa. St., 12, it was said: "A discharge of the jury, in a capital case, after the trial has begun, is not a continuance of the cause. It is the end of it. And for all purposes of after protection, it is the same to the prisoner as an acquittal, unless it was done with his own consent or demanded by some overwhelming necessity, such, for instance, as the sickness or death of a juror."

A case precisely in point is *United States v. Haskell*, 4 Wash. [U. S. C. C.], 402. That was a capital case, and the jury was discharged on the ground of the insanity of one of its members. This discharge was without the consent of the prisoner or his counsel, and it was held that such discharge was not a good plea in bar to the further prosecution of the prisoner with which he was first put upon trial.

Whether the plea be considered as a valid plea in bar or be considered as a motion based on the facts disclosed by the record, the court did not err in refusing to discharge the prisoner, as the discharge of the first jury because of the insanity of one of its members, without prejudice to the after prosecution of the prisoner, was authorized both by the Criminal Code of the state and by the rules of the criminal law.

33. The thirty-third assignment of error is that the court erred in refusing to give instruction 20½ requested by the plaintiff in error. The instruction is as follows: "The defendant asks the court to instruct the jury as follows: 'In a criminal prosecution the confessions or admissions of the accused are not alone sufficient to justify a conviction. That the crime has been committed must be established by other testimony.'" It is true that the *corpus delicti* is the foundation of every criminal prosecution, and it is also true that the confession of the defendant that he committed the crime is not alone sufficient evidence to sustain his conviction thereof. (*Dodge v.*

*People*, 4 Neb., 220; *Priest v. State*, 10 Neb., 393; *Ashford v. State*, 36 Neb., 38.) But by the instruction under consideration the court was also requested to charge the jury that the *corpus delicti* must be established by other evidence than the confessions of the accused. This is not the law. We understand the law to be that while the confessions of the accused are not alone sufficient to establish the *corpus delicti*, yet such confessions, if made without inducement or duress,—that is, if they are freely and voluntarily made,—are competent evidence to be considered by the jury, together with all other facts and circumstances in evidence in the case which tend to show that the accused committed the crime with which he is charged. When complaint is made of the refusal of the district court to give an instruction asked, the burden is upon the party complaining to show, not only that he was probably prejudiced by the refusal of the court to give the instruction, but he must also show that the entire instruction was correct as a proposition of law and applicable to the facts in evidence in the case. The court did not err in refusing to give instruction 20½, because it is not the law that confessions of an accused are not competent evidence to be considered with other evidence and circumstances in the case in determining whether the accused committed the crime with which he is charged.

34. The next assignment of error is that the court erred in refusing to give instruction 21½ asked by the plaintiff in error. The instruction, so far as material here, is as follows: "The court instructs the jury that, although proof of the admissions of a party to a suit, when it appears that the admissions were understandingly and deliberately made, often affords satisfactory evidence, yet as a general rule the statement of a witness as to the admissions of the party should be received by the jury with great caution, as that kind of evidence is subject to much imperfection and mistake; the party himself may not have clearly expressed his meaning, or the witness may have misunderstood him; and it frequently

happens that the witness by unintentionally altering a few of the expressions really used gives an effect to the statements completely at variance with what the party did actually say." This instruction would have been a good argument for counsel to address to the jury; but we do not think the court erred in refusing to give it. The court in its own charge carefully and properly left it for the jury to say whether Davis made the confessions attributed to him by the witnesses for the state.

35. The next assignment of error is that the court erred in refusing to give instructions $22\frac{1}{2}$, 23, 24, and 25 at the request of the plaintiff in error. The substance of these instructions is embraced in the charge of the court, and this court will not reverse a case for refusing an instruction when the substance thereof has been given in other instructions. (*Ford v. State*, 46 Neb., 390; *Brumback v. German Nat. Bank*, 46 Neb., 540; *Korth v. State*, 46 Neb., 631; *Bush v. State*, 47 Neb., 642.)

36. The next assignment of error is that the court refused to give instructions Nos. 1 and 8 requested by the plaintiff in error. No. 1 is as follows: "Where, in a criminal case, the evidence is circumstantial, the circumstances established must, to warrant a conviction, be such as to exclude every reasonable hypothesis except that of the defendant's guilt." And instruction No. 8 was to the same effect. It is true that in order to warrant a conviction on circumstantial evidence it must be of so conclusive a character as to prove beyond a reasonable doubt that the accused and no other person committed the offense charged. (*Kaiser v. State*, 35 Neb., 704.) But the court did not err in refusing to give these instructions, as it gave the substance of them in its charge to the jury.

37. The thirty-seventh assignment of error is that the court erred in refusing to give instruction No. 3 asked by the plaintiff in error and in giving instruction No. 19 of the instructions given on the court's own motion. Both instructions were directed to the law of reasonable doubt. The instruction given by the court was as follows: "The

law requires before you can find the defendant guilty the evidence must have established his guilt beyond a reasonable doubt.   Mere suspicion of guilt, however strong, or a preponderance of all the evidence in the case against the defendant, will not do upon which to base a verdict of guilty.   The doubt which the juror is allowed to retain in his own mind, and under which he should render his verdict of not guilty, must always be a reasonable one. A doubt produced by undue sensibility in the mind of any juror in view of the consequences of his verdict is not a reasonable doubt, and a juror is not allowed to create sources or material of doubt by resorting to trivial or fanciful suppositions and remote conjectures as to possible states of fact different from that established by the evidence.   You are not at liberty to disbelieve as jurors if from the evidence you believe as men.   Your oath as jurors imposes on you no obligation to doubt where no doubt would exist if no oath had been administered. Hence, if, after a careful and impartial consideration of all the evidence, you can say that you feel an abiding conviction of the guilt of the defendant and are satisfied to a moral certainty, a certainty that convinces and directs the understanding and satisfies the reason and judgment of those who are bound to act conscientiously on the truth of the charges made against the defendant, then, and in that event, you are as jurors satisfied beyond a reasonable doubt.   A reasonable doubt does not consist of possible or conjectural doubt, but a doubt that would justify an acquittal must be reasonable, and it must arise from a candid and impartial investigation of all the evidence in the case, and unless it is such that were the same kind of doubt interposed in the graver transactions of life it would cause a reasonable and prudent man to hesitate and pause, it is insufficient to authorize a verdict of not guilty." This instruction included all that was asked in the instruction asked by the plaintiff in error and refused; and instructions similar to the one given by the court have been many times approved by this court.   (See

*Polin v. State,* 14 Neb., 540; *Langford v. State,* 32 Neb., 782; *Willis v. State,* 43 Neb., 102; *Carleton v. State,* 43 Neb., 373; *Collins v. State,* 46 Neb., 37; *Lawhead v. State,* 46 Neb., 607; *Barney v. State,* 49 Neb., 515.) The exceptions to the action of the court are overruled.

38. The next assignment of error is that the court erred in refusing to give instructions 5 and 6 asked by the plaintiff in error. The instructions are substantially the same, and No. 5 is as follows: "The defendant is pre-' sumed to be innocent, and that presumption begins with the beginning of the trial and continues all through the case until the state has produced sufficient evidence to satisfy the mind of each juror of the existence of every material fact necessary to show his guilt beyond a reasonable doubt; and so long as there exists in the mind of any one of the jurors a reasonable doubt of the defendant's guilt it is your duty to acquit him." We have no fault to find with the proposition that the defendant is presumed to be innocent and that such presumption begins with the accusation and continues until the state has established the guilt of the defendant beyond a reasonable doubt. But we do not think it is the law that the jury is bound to acquit the defendant if one of the jurymen entertains a reasonable doubt of the defendant's guilt. In such a case of course the jury cannot convict, but it does not therefore follow that it then becomes the duty of the eleven other jurymen to surrender their convictions and acquit. We have not been cited by counsel to any case which supports this contention, nor do we think any such case can be found. In support of this argument we are, however, referred to *Franklin v. State,* 66 N. W. Rep. [Wis.], 107. But that case only holds that a conviction cannot be had if any juror has a reasonable doubt of the defendant's guilt. To the same effect is *State v. Hamilton,* 32 Ia., 572. Still another case cited by counsel is *Stitz v. State,* 4 N. E. Rep. [Ind.], 145. In that case the following instruction was held erroneous: "While each juror must be satisfied of the defendant's

guilt beyond a reasonable doubt to authorize a convic-
tion, such reasonable doubt, unless entertained by all the
jurors, does not warrant an acquittal." But that is a
very different thing from saying that it is the duty of the
jury to acquit if one of its members entertains a reason-
able doubt of the guilt of the accused. In *Parker v. State,*
35 N. E. Rep. [Ind.], 1105, it was said that an instruction
that the defendant should not be convicted so long as any
juror entertains a reasonable doubt of his guilt should
be given. *Carter v. State,* 15 So. Rep. [Ala.], 893, holds
that on a criminal trial it is error to refuse to charge that
each juror must be satisfied beyond a reasonable doubt
that the accused is guilty before he can be convicted; but
there is a great difference in charging that each juror
must be satisfied beyond a reasonable doubt of the de-
fendant's guilt before the jury will be justified in convict-
ing him and charging the jury that if one juror enter-
tains a reasonable doubt of the defendant's guilt that the
jury must acquit him. The authorities, then, of counsel
for plaintiff in error do not sustain the argument. The
court did not err in refusing to give the instruction under
consideration.

39. The thirty-ninth assignment of error relates to the
refusal of the court to give instructions 31 to 39, both in-
clusive, of the instructions requested by the plaintiff in
error. These instructions were directed to the subject
of reasonable doubt. The court in its charge to the jury
sufficiently instructed the jury upon that subject and it
did not err in refusing to give either of the instructions
mentioned in this assignment.

40. The fortieth assignment of error is that the court
erred in giving instruction No. 20 given on its own mo-
tion. In this instruction the court stated to the jury that
there had been offered in the case both direct and cir-
cumstantial evidence. He then explained to the jury the
meaning of the terms "direct evidence" and "circumstan-
tial evidence;" and charged that the circumstantial evi-
dence which had been received was legal and competent

and then said: "And if it is of such character as to ex-
clude every reasonable theory, supposition, or hypothesis
other than that of the defendant's guilt, then and in that
event it should be given the same weight by you as direct
evidence." The first criticism upon this instruction is
that the court had no right to tell the jury that there had
been introduced in the case evidence both direct and cir-
cumstantial. To sustain this criticism we are cited to
*Long v. State*, 23 Neb., 33. In that case we held that an
instruction was erroneous because the court told the jury
that the evidence introduced included not only the sworn
testimony of the witnesses who had testified, but all the
circumstances surrounding the tragedy. This, of course,
left the jury to wander outside of the evidence; but the
instruction under consideration is not open to that criti-
cism. Here the court stated what was a fact and one
every juryman of average intelligence must have known
as well as the court, viz., that there was before the jury
evidence both circumstantial and direct. The second
criticism is that the court erred in saying to the jury that
it should give the same weight to the circumstantial evi-
dence as to the direct evidence. We think this remark of
the court was not a happy one, and the instruction would
have been better without it; but we do not think the
plaintiff in error was prejudiced by the remark when it is
considered in connection with the remainder of the in-
struction. The court did not unconditionally instruct the
jury to give the same weight to circumstantial evidence
as direct evidence, but properly submitted the weighing
and consideration and effect to be given to the circum-
stantial evidence to the jury, and then told them that if,
after weighing and considering it, they were satisfied be-
yond a reasonable doubt of the defendant's guilt they
should give it the same weight as they did the direct evi-
dence. The case of *Gill v. State*, 27 S. W. Rep. [Ark.],
598, cited by counsel in this connection to show that the
instruction of the court under consideration was errone-
ous, does not sustain counsel's contention. In that case

the court instructed the jury that "If the facts and circumstances proven by the preponderance of evidence are such as to satisfy the jury beyond a reasonable doubt," then such evidence is entitled to the same weight as direct or positive testimony. This instruction the court held was erroneous, because it would permit the defendant to be convicted upon a preponderance of the evidence.

41. The forty-first assignment of error is that the court erred in giving instruction No. 24 of the instructions given upon its own motion. That instruction is in the following language: "A large number of witnesses have appeared before you in this case; and the court now instructs you that you are the sole judges of the credibility of their testimony, and in determining the weight to be given the testimony of the several witnesses you shall take into consideration their interest in the event of this prosecution, if any such interest is proved; their motive for testifying as they have, if any is shown; their conduct and demeanor while testifying; their apparent fairness or bias, if any such appears; their appearance on the witness stand; the reasonableness of the stories told by them; their means of information concerning the matters and things about which they testify; and all the evidence and circumstances tending to corroborate or contradict any witness,—and then give to the testimony of each witness such weight and credit as to you it shall seem entitled. If the fact appears that witnesses disagree in minor points in their recollection and recital of the several matters and transactions sought to be proved in this case it does not necessarily militate against the candor of any of them; it may only indicate a failure of observation; and the court instructs you as jurors you have not the right to captiously or unreasonably disregard the testimony of witnesses, but unless there appears to be something that indicates a lack of candor or truthfulness on the part of any witness, the testimony of each witness should receive proper and careful consideration by the jury. You are to determine this case and arrive at your

verdict from the evidence now before you, and are not to be influenced by statements or insinuations or any other fact or circumstance that is not in evidence in this case." The plaintiff in error has no reason to complain of this instruction.

42. The forty-second assignment of error is that the court erred in giving instruction No. 10 of the instructions given upon its own motion. This instruction was directed to the subject of malice, correctly stated the law, and has been sufficiently considered.

43. The forty-third assignment of error is directed to the subject of the plaintiff in error's alleged "former jeopardy." This we have already disposed of.

44. The railroad wreck frequently mentioned in this opinion occurred about 10 o'clock on a moonlight evening. The evidence for the state tended to show that just prior to the occurrence of the wreck some person with a monkey wrench and a claw-bar, introduced in evidence, had unscrewed the nuts on the bolts which held together two of the rails on the trestle and pulled out some of the spikes which fastened one rail to the ties on the trestle; that this displacement caused the wreck of the train and the death of Hambell, and that Davis, with said monkey wrench and claw-bar, displaced the fixtures as just stated. Davis called as witnesses a man and his daughter, who were fishing within six or seven hundred feet of the trestle where the wreck occurred, and until about dark of that day, and they testified that they did not see any-one on the trestle nor hear any noise there before they left that locality. The object of this evidence, of course, was to show that these fixtures had not been displaced when the fishermen left the vicinity of the trestle and to raise the inference that Davis could not have displaced the fixtures from that time until the wreck occurred. Davis also called as witnesses one or two men who testified as experts, being machinists or railroad men, and they swore that it was impossible for a man to remove the nuts from the bolts of the track with the monkey

wrench in evidence.   The state in rebuttal called a wit-
ness who was not an expert, nor a railroad man, nor a
machinist, who swore that in the presence of some other
men and with the monkey wrench in evidence he removed
eight nuts from as many bolts from a portion of the Rock
Island Railway similar to the track on the trestle, except
that it was not on a trestle, and with the claw-bar in
evidence he pulled all the spikes which held down one
rail on a part of the track of the Rock Island Railway sim-
ilar in all respects to the track on the trestle, except that
it was not on a trestle, and that he did all this work in
twenty-one minutes.   The next assignment of error is
that the court erred in admitting this evidence of the
state.   It is first said that the evidence was not rebuttal.
We think it was.   The evidence of the state's witness
that with the monkey wrench in evidence he did remove
eight nuts from as many bolts of the railway track
tended to rebut the expert testimony of Davis' witness
that it was impossible for a man to remove one of those
nuts with that monkey wrench.   The evidence of the
state's witness that he unscrewed these nuts and with
the claw-bar in evidence pulled all the spikes which held
down a rail, and did the whole work in twenty-one min-
utes, tended to rebut the inference that one man could
not have displaced these fixtures from the time the fisher-
man left the vicinity of the trestle until the time the
wreck occurred.   Another argument is that the evidence
was incompetent.   When the oral argument made at the
bar on this question closed, it left the writer under the
impression that this evidence was incompetent and that
the court had erred in admitting it.   But a careful ex-
amination of the record and of the authorities leaves no
doubt in our minds that the evidence was entirely com-
petent.   The fact that the state's witness in removing the
nuts and pulling the spikes operated on a part of the track
not on a trestle did not go to the competency of the evi-
dence, but simply to its weight,—to the effect to be given
it by the jury.   The track where the state's witness made

the experiment was in every particular identical with the track on the trestle where the displacement occurred, except the fact that one track was on the earth and the other on a trestle. The ties were the same, both being white oak, the rails were of the same quality, the spikes were of the same quality, the bolts and angle-bars were the same, the nuts were the same, and put on in the same manner, with washers. The place at which the experiment was made was a different one from the place where the displacement of the fixtures occurred, but the experiment was made under substantially the same conditions as the displacement of the fixtures. This was sufficient to make the evidence competent, and it was for the jury to consider the place where the displacement of the fixtures occurred and the place where the experiment was made and then to give such weight to the testimony of the state's witness who made the experiment as they thought it deserved. The cases are too long for review, but the authorities are practically all one way. (See, among others, *Smith v. State*, 2 O. St., 511; *Chicago, St. L. & P. R. Co. v. Champion*, 32 N. E. Rep. [Ind.], 874; *Lake Erie & W. R. Co. v. Mugg*, 31 N. E. Rep. [Ind.], 564; *State v. Justus*, 8 Pac. Rep. [Ore.], 337; *Commonwealth v. Piper*, 120 Mass., 185; *Byers v. Nashville, C. & St. L. R. Co.*, 29 S. W. Rep. [Tenn.], 128; *State v. Isaacson*, 65 N. W. Rep. [S. Dak.], 430; *Moore v. State*, 33 S. W. Rep. [Tenn.], 1046; *Wilson v. State*, 36 S. W. Rep. [Tex.], 587.)

45. The forty-fifth assignment of error is that the district court erred in not granting the plaintiff in error a new trial on account of the misconduct of the jury. It appears that there were introduced in evidence nuts, bolts, angle-bars, spikes, monkey wrench, claw-bar, and a railroad tie, all of which things, except the monkey wrench and claw-bar, constituted a part of the track of the railway where this wreck occurred. It is alleged that during some recess of the court, when the defendant was absent from the court room, the jurymen were permitted to experiment with these fish-plates, nuts, bolts, tie,

spikes, and monkey wrench and claw-bar by driving in the spikes and then removing them with the claw-bar and by putting the nuts on the bolts and then unscrewing them with this monkey wrench. This conduct of the jury was expressly denied by affidavits filed in behalf of the state in opposition to the motion for new trial on that ground, and we cannot say that the court erred in reaching the conclusion that it did,—that the alleged misconduct of the jury had not in fact occurred.

46. In the forty-sixth argument made by the plaintiff in error are embraced a large number of assignments of error which relate to the ruling of the court in permitting and in refusing to permit certain questions to be answered. To review each one of these assignments of error would extend this opinion, already too long, to an unreasonable length, and it must suffice to say that after a careful study of the record and the rulings of the court complained of we find no ruling made which we think was prejudicial to the plaintiff in error.

47. It appears from the record that after the reception and recording of the verdict rendered in this case the prisoner was remanded to jail; that afterwards, in his absence, his counsel filed a motion for a new trial and the same was argued and overruled. It is now argued that the judgment must be reversed because of the absence of the prisoner from the court room at the time the motion for a new trial was filed, argued, and overruled. Whether the record must disclose that a person convicted of a felony was present in court at the time his motion for a new trial was overruled in order to sustain a judgment pronounced against him on such conviction is a question about which there is and has been some diversity of opinion among the courts.

In *Rex v. Hollingberry*, 6 Dow. & R. [Eng.]; 344, a defendant was in actual custody of the marshal upon a criminal process in consequence of an indictment in the court of king's bench, and it was held that he need not be present when a motion for a new trial was made on his behalf in the same court.

In *Rex v. Scully*, Alc. & N. [Ir.], 262, it was held that all the defendants convicted upon a criminal information must be in court upon a motion on their behalf for a new trial.

In *Rex v. Spragg*, 2 Bur. [Eng.], 928, several prisoners, after conviction, were in custody and the court in their absence declined to hear a motion filed by their counsel in arrest of judgment. The court declared that it was a fixed and invariable rule that the defendants must, after conviction, be present in court to move in arrest of judgment.

In *Berkley v. State*, 4 Tex. App., 122, the defendant was convicted of a felony, and it was held that it was improper for the trial court to hear and overrule his motion for new trial in his absence.

In *State v. Parsons*, 19 S. E. Rep. [W. Va.], 876, Parsons was convicted of a felony, and the court reversed the judgment pronounced against him because the record did not affirmatively show that he was present when the trial court overruled his motion for a new trial.

The constitution of this state, section 11 of the Bill of Rights, provides that one accused of a crime shall have the right to appear and defend in person or by counsel, and to meet the witnesses against him face to face; and section 464 of the Code of Criminal Procedure provides: "No person indicted for a felony shall be tried unless personally present during the trial."

The constitution and the statute of Missouri are practically the same as our own. In *State v. Brown*, 63 Mo., 439, Brown was convicted of murder. In his absence the court disposed of his motion for a new trial, and the supreme court held that this action of the trial court was not a ground for a reversal of the judgment; that such a motion was not a proceeding during the trial within the meaning of the statute. The point was again presented to the supreme court of Missouri in *State v. Lewis*, 80 Mo., 110, and the court held that unless the record affirmatively showed that the prisoner was denied the

right of being present when his motion for a new trial was argued and determined his absence at that time would not be a sufficient ground for reversing the judgment.

The constitution and statute of the state of Ohio are similar to ours, and in *Griffin v. State*, 34 O. St., 299, a felony case, it was held that it was no ground for reversing the judgment pronounced on conviction if the defendant's motion for a new trial was made, argued, and overruled in his absence, he having made no objection to this action of the court until after the sentence was pronounced.

In *People v. Ormsby*, 12 N. W. Rep. [Mich.], 671, it was held: "After the regular conviction of a person charged with crime he can no longer insist upon being present in court for further proceedings, such as the disposition of a motion for a new trial."

In *State v. West*, 13 So. Rep. [La.], 173, it was held: "The presence of the defendant in court is not essential either at the trial of a motion for new trial or one in arrest of judgment." And this conclusion was reached by the court notwithstanding the fact that on the trial of the motion for a new trial testimony was offered in behalf of the prisoner. To the same effect see *Camp v. State*, 16 S. E. Rep. [Ga.], 379.

In *Miller v. State*, 29 Neb., 437, Miller was convicted of murder in the first degree, and assigned as an error in this court the ruling of the trial court on a motion to quash, and a demurrer to the information, and a plea in abatement, and the motion of the accused for a continuance; all of these rulings having been made in the absence of the prisoner. This court overruled the assignment of error and, speaking through NORVAL, J., after citing section 11 of the Bill of Rights and section 464 of the Criminal Code, said: "We do not believe that either of the above quoted sections have reference to the presentation by counsel of questions of law to the court or interlocutory proceedings prior to the commencement of the selection of the jury, but rather that the accused shall

be present during the trial of the issue of fact raised by his plea of not guilty. The hearing of motions and demurrers prior to choosing the jury is no part of the trial."

The principle decided in the Miller case involves the principle under consideration here. No doubt the defendant charged with a felony has an absolute right to be present in court in person when he is arraigned and pleads to the indictment; to be present when the trial begins, and at all times during the trial; to be present when the verdict is received and recorded; and when he is arraigned for sentence and the sentence is pronounced; and the record, to support a judgment of conviction or sentence for a felony, must affirmatively disclose the prisoner's presence at all those times. But neither the filing, the argument, nor the ruling upon a motion for a new trial is any part of such trial within the meaning of the constitution or the section of the Criminal Code quoted. Our conclusion is that a person convicted of felony and represented by counsel cannot as a matter of right insist on being present in court either at the time of the filing of the argument or the ruling upon his motion for a new trial.

48. Another assignment of error is that the court erred in refusing the plaintiff in error a new trial on the ground of newly-discovered evidence. We do not think that the record shows that the plaintiff in error could not have discovered and produced at the trial the evidence which he now claims to be newly discovered had 'he exercised reasonable diligence. But assuming that all reasonable diligence was exercised for the discovery and production of this evidence, and that it was material for the plaintiff in error, it remains to be said that the evidence was cumulative in its nature; and had the new trial been granted and this newly-discovered evidence admitted we cannot say that we think it would probably have changed the result. The assignment of error must therefore be overruled. (*Tolleson v. State*, 23 S. E. Rep. [Ga.], 993; *Fitzgerald v. Brandt*, 36 Neb., 683; *Smith v. Hitchcock*, 38

Neb., 104; *People v. Demasters,* 109 Cal., 607; *Porter v. State,* 32 S. W. Rep. [Tex.], 695; *Turner v. State,* 36 S. W. Rep. [Tex.], 87.)

49. Another ground of the motion for a new trial was that two of the jurymen stated on their *voir dire* examination that they had neither formed nor expressed any opinion as to the guilt or innocence of Davis; and that he discovered, after the verdict was rendered, that each of such jurors had, prior to being called as a juror, made statements to the effect that they thought he was guilty and ought to be hung. The argument is that the court erred in not setting aside the verdict because of the unfairness of these jurors as disclosed by this showing. But the district court by its ruling found in effect that neither of the jurors had made the statements attributed to them, and as they expressly denied having made any such statements, we cannot disturb the finding of the district court in that respect.

50. The final argument is that the verdict is not supported by sufficient evidence. The record shows without conflict that about 10 o'clock on the evening of the 9th of August, 1894, a passenger train on the Rock Island railway fell, or was thrown, from a trestle some four miles from the post-office in the city of Lincoln; that by such derailment William O. Hambell was instantly killed, and ten other persons either instantly killed or died from the effect of injuries there received. The record further discloses that the engine and cars of said train before its wreck were in good repair; that the trestle and the track were in good repair; that they were comparatively new; that numerous trains had been daily running over said trestle and track since its construction; that the trestle and track had been patrolled and examined that day. Immediately after the occurrence of said wreck said trestle and track were examined, and it was found that a number of the spikes which fastened one of the rails on such trestle to the ties thereon had been recently removed. On the ties were the marks or indentations

made by an instrument known as a claw-bar, made and used expressly for the purpose of pulling railroad spikes from ties. Some of the extracted spikes found showed fresh marks of the claw-bar. The nuts upon the bolts which held together two of the rails had been removed. These nuts showed the fresh marks of a wrench. The rail from which the spikes had been removed had been moved from its alignment and in a direction from its companion rail. One at least of the spikes which had held down said rail and had not been completely removed furnished an indication of the rail having been pushed against it and thus bending it down after it had been partly pulled out. On the ties on the trestle next to the rail which had been moved from its alignment were marks or indentations where the wheels of the locomotive had struck on the ties after leaving the displaced rail, while no such marks or indentations were found on the ties next to the companion rail of the one displaced. A monkey wrench was found on the trestle, and in the weeds near by the trestle was found a claw-bar and the heel of this claw-bar fitted in the indentation in the ties supposed to have been made by it in removing the spikes. The plaintiff in error was seen at the wreck both by the passengers and crew of the train who were left alive after the wreck. He was seen there within a very few minutes after the wreck occurred, and was the first person seen in the vicinity after the wreck save and except the survivors of the crew and passengers. A track of the Union Pacific Railroad passes under the trestle of the Rock Island railway where this wreck occurred. Late in the afternoon, or early in the evening, of August the 8th a colored man, afterwards identified as Davis, was seen going down this Union Pacific track towards the trestle. He had on his shoulder some instrument resembling a claw-bar or hand-spike. In his hand he had a sack in which was something. Prior to the occurrence of the wreck Davis was laboring on a farm near the city of Lincoln, and said to certain persons that he was tired of

farming and that the railroad or a railroad would have
to give him a job.   One day during the summer he was
passing, with another man, by this trestle and observed
to his companion in substance that that would be a good
place to "hold up" a train.   A few days before the wreck
he purchased a new suit of clothes, which he wore.   The
coat of this suit had on it a certain kind of buttons and
the buttons were fastened on with rings.   Just prior to
the wreck Davis was seen to have in his possession a
photograph, or picture, of some theatrical woman.   After
the wreck this coat of Davis was found in the weeds near
the trestle where the wreck occurred.   In the pocket of
the coat was this picture.   Very soon after the wreck
Davis told various persons that he was present at this
wreck, and when asked how he happened to be there he
told some persons that he was at the club in Lincoln,
heard the noise of the wreck, and ran down there.   Now
this club house is four miles from the place of the wreck.
He told other persons that he had been to Kearney and
was returning from Kearney and came over the Rock
Island railroad, and on being told by these parties that
the Rock Island railroad did not pass through Kearney,
he stated that he had walked across the country and
taken the train.   He told other persons that he boarded
the Rock Island train at Rokeby, a station between Lin-
coln and Fairbury.   No passenger or employe of the rail-
road saw any colored man on the train.   He told other
witnesses that at the time the wreck occurred he was in
a shed stealing chickens about three-quarters of a mile
from the place of the wreck; that he heard the noise and
ran down there.   On Sunday after the wreck he was out
at a farm where he had been employed; told the people
there that he was at the wreck and explained to them,
or to at least one of them, how he thought it occurred;
that he thought the wreck had been caused by some one
removing the nuts from the fish-plate bolts and by pull-
ing up the spikes that held down the rails; on his com-
panion saying that he did not think one man could do

that, he said he thought it could be done. After he was arrested he voluntarily told several persons that he displaced the fixtures on this trestle and caused this wreck; that he did not do it intending to kill anybody, but that he did it intending to flag and stop the approaching passenger train, call attention to the displacement of the track, and for his conduct in that respect he expected the railway company to give him a job, or the passengers to raise him a purse. He also explained to these witnesses that when he heard the passenger train approaching he signalled the engineer with his coat, but he either did not see him or paid no attention to it, and that the train was on him sooner than he expected, and that he threw the claw-bar into the weeds. To another witness he stated that he saw the engineer and fireman on the locomotive put their arms around each other as the engine went over the trestle. This is not all the evidence by any means, either direct or circumstantial, but it is sufficient in our judgment to sustain the finding of the jury (1) that the wreck and the death of Hambell were caused by the displacement of the fixtures of the track, and (2) that Davis purposely and maliciously displaced these fixtures. There are, doubtless, in this record some errors, but after spending weeks upon its examination our deliberate conviction is that the record contains not one error prejudicial to the interests of the accused. Indeed, this record of itself affords conclusive evidence of the humanity and liberality of our criminal laws. This prisoner is a man without property and without influential friends, and yet this commonwealth, whose laws he has so shamelessly violated, has, at an enormous expense to itself, furnished him all witnesses whose presence he required, and employed counsel for him, who have waged in his behalf a legal battle which redounds to their credit. Possibly the jury might have been justified in finding him guilty of only manslaughter; but if the evidence in this record is true, and the jury—the only tribunal which the law has designated to pass upon the credibility of evidence—has

by its verdict said that the evidence is true, then this
prisoner is an enemy to the human race, and his liberty
a menace to society; and the verdict of the jury and the
judgment of the court are the ones best calculated for the
vindication of the criminal laws of the state and the
protection of the lives and property of its citizens.  The
record contains no reversible error and the judgment
of the district court must therefore be, and it is in all
things,

AFFIRMED.